803 A.2d 460

**DELMARVA POWER & LIGHT COMPANY**
d/b/a Connectiv Power Delivery, et al.

v.

**PUBLIC SERVICE COMMISSION OF MARYLAND, et al.**

No. 75, Sept. Term 2001.

Court of Appeals of Maryland.

April 8, 2002.

Deborah E. Jennings (Brett Ingerman of Piper Marbury Rudnick & Wolfe LLP of Baltimore), for Baltimore Gas and Elec. Co., on brief.

Christopher R. Mellott (Thomas P. Perkins, III of Venable, Baetjer and Howard, LLP of Baltimore; Randall V. Griffin, Christie Day Cannon of Conectiv of Wilmington, DE), for Delmarva Power & Light Co. d/b/a Conectiv Power Delivery, on brief.

Paul S. Buckely of Washington, D.C. (Lee A. Satterfield, Harry S. Johnosn, Dwight W. Stone, II of Whiteford, Taylor & Preston of Baltimore), for Washington Gas Light Company, on brief.

Susan Stevens Miller, General Counsel (Brock C. Hutton, Assistant Genral Counsel, on brief), Baltimore, Richard T. Miller, Asst. People's Counsel (Michael J. Travieso, People's Counsel, Baltimore), on brief, Gary R. Alexander (Chantel R. Ornstein of Alexander & Cleaver, P.A., Annapolis, on brief), for Mid-Atlantic Petroleum Ditributors Association, Air Conditioning Contractors of America - National Capital Chapter, Maryland Alliance for Fair Competition, and Air Pro Inc.

Marta D. Harting (Piper Marbury Rudnick & Wolfe, LLP), Baltimore, for Chesapeake Utilities Corporation.

Kenneth W. Christmas, General Counsel, Francis X. Wright (Eastwick, Rose & Wright, P.A.), Margaret Lee Norton (Norton & Jonson, LLC), Baltimore, for Columbia Gas of Maryland, Inc.

Kirk J. Emge, Paul H. Harrington, William D. Shapiro (Pepco Holdings, Inc.), Washington, D.C., Richard D. Gary

**4**

(Hunton & Williams), Richmond, VA, Ted J. Murphy, Edwin
G. Kichline, Kara D. Little (Hunton & Williams), Washington,
D.C., for Potomac Elec. Power Co.

Andrew H. Marks, Jennifer N. Waters (Crowel & Moring,
LLP), Washington, D.C., for BGE Home Products and Ser-
vices, Inc.

William J. Murphy, Robert T. Shaffer, III (Murphy &
Shaffer), Baltimore, Kathy L. Mitchell (Allegheny Energy
Building), Hagerstown, for the Potomac Edison Co. d/b/a
Allegheny Power.

Gary R. Alexander, Chantel R. Ornstein (Alexander &
Cleaver, P.A.), Annapolis, for Amicus Curiae, Mirant Mid-
Atlantic, LLC.

BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL,
HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

We have before us a broad range of issues arising from an
order of the Public Service Commission (PSC) that imple-
ments, in part, the restructuring and partial deregulation of
electric and natural gas utilities in Maryland. Most of the
issues presented by the utilities are substantive in nature,
testing whether the Commission has the authority to do some
of what it did. The only issue that we need address on the
merits, however, is whether the PSC order constitutes a
regulation, as defined in the Administrative Procedure Act
(APA), and is ineffective for failure to comply with the re-
quirements of that Act. We shall answer that question in the
affirmative, and, for that reason, reverse the judgment of the
Circuit Court.

## BACKGROUND

The early operation of what we now refer to as public
utilities, including electric and gas companies, was, for the
most part, under franchises conferred by the local municipali-
ties in which they did business, franchises that they needed in

order to lay pipes or string wires under, along, or above public streets and highways. In conformance with the prevailing economic philosophy that competition produced the greatest efficiency and thus the greatest public good, many municipalities were content to grant multiple franchises, which led to several companies competing in the same service area. It eventually became apparent, however, that the resulting competition was not in the public interest—some of the companies disappeared and the remaining competition became chaotic and inefficient. *See,* in general, Gregg A. Jarrell, *The Demand for State Regulation of the Electric Utility Industry,* 21 J.L. & ECON. 269, 273–74 (1978); *see also* OSCAR L. POND, A TREATISE ON THE LAW OF PUBLIC UTILITIES chs. 29–31 (3d ed.1925). As noted by one commentator:

> "Competition which was relied upon to insure for the public reasonable rates and satisfactory service proved to be elusive and non-enduring.... It continually was disappearing as the result of bankruptcies, consolidations, and formal or informal agreements, leaving in its wake torn-up streets, 'dead' wires and useless poles and pipes, enormous overcapitalization, and paralyzed service."

BURTON BEHLING, COMPETITION AND MONOPOLY IN PUBLIC UTILITY INDUSTRIES 54 (1938), quoted in Jarrell, *supra,* at 274.

The failure of competition to provide efficient service led public policy planners and governments to recognize these kinds of utilities as "natural" monopolies. The actual experience seemed to confirm the economic theory that, "freedom of entry is wasteful if firms have extensive scale economies relative to the size of the market. If the average cost curve of the typical firm falls over the entire extent of market demand, resources are necessarily wasted if more than one firm produces, since a single firm could produce the market output more cheaply." Jarrell, *supra,* at 272. *See also* HAROLD KOONTZ AND RICHARD W. GABLE, PUBLIC CONTROL OF ECONOMIC ENTERPRISE 208–09 (1956). The economic imperative that each firm would have to expand output up to what the market would bear in order to lower unit costs and thereby compete would eventually drive all but one firm out of business; hence,

the notion of a "natural" monopoly. The problem, of course, was that, once a monopolistic state was achieved, the remaining firm was free to inflate its prices beyond those which unit costs would justify, thereby producing at best the very inefficiency, from the consumer's point of view, that would have prevailed under the competitive model.

This left governments the choice of either acquiring the enterprise and operating it as a public entity or allowing the private monopoly to continue but under extensive public regulation, as a "guarded" monopoly. The initial choice was the former, but increasingly in the early Twentieth Century, it became the latter. Borrowing from notions articulated in Matthew Hale's Seventeenth Century treatise on the regulation of seaports, *De Portibus Maris*, both the State and Federal governments eventually came to accept the principle, as a matter of political economy, that the public good was best served by not only permitting, but assuring, a monopolistic structure, coupled with extensive government control over the rates, service, and operations of such a structure. *See* Herbert Hovenkamp, *Technology, Politics, and Regulated Monopoly: An American Historical Perspective*, 62 TEX. L.REV. 1263, 1282–84 (1984); *Munn v. Illinois*, 94 U.S. 113, 24 L.Ed. 77 (1876). Pond observes that, "[u]nder this method the state through its [public utility] commission takes the place of competition and furnishes the regulation which competition cannot give, and at the same time avoids the expense of duplication in the investment and operation of competing municipal public utilities." POND, *supra*, § 901.

Both the Federal and the State governments employed a commission approach to the regulation of energy production and distribution. After 1920, the interstate aspects became subject to regulation by the Federal Power Commission, later by the Federal Energy Regulatory Commission. Intrastate aspects were subjected to the authority of State public utility commissions that began forming in the first decade of the Twentieth Century.

Maryland adopted this approach in 1910, when the Legislature created the Public Service Commission and authorized it to regulate the activities of public service companies, including gas and electric companies. The regulation was pervasive. Over time, the PSC was given the authority, among other things, (1) to restrict actual entry into the regulated industry,[1] (2) to prescribe standards for safe, adequate, reasonable, and proper service for any class of utility, PUC § 5–101(a), (3) to require a utility to continue any service that it renders to the public under a franchise, *id.* § 5–103(a), (4) to preclude the transfer or abandonment of a franchise, *id.* § 5–202, (5) to regulate the rates charged by utilities by setting a "just and reasonable rate" for them, as a maximum rate, a minimum rate, or both, *id.* § 4–102, (6) to prohibit a utility from acquiring the capital stock of another utility incorporated in Maryland, *id.* § 5–203, (7) to require a variety of reports and information from utilities, *id.* §§ 5–302, 6–201 to –210, and (8) to regulate the issuance of stock and evidence of indebtedness by utilities, *id.* § 6–102.

Under this regime, gas companies and electric companies were assigned geographical areas of the State and allowed to operate, in those regions, as regulated monopolies. *See,* for example, Case No. 6017, Order No. 56203, *In the Matter of the Establishment of Service Areas of Electric Utilities within the State of Maryland,* 57 Md. PSC 59 (1966) (assigning geographic territories to electric companies). If the gas and electric services in a prescribed area were provided by different companies, there was some degree of competition between them, but there was no effective competition between like companies operating in different areas. Most of those companies—the larger ones, at least—were, and remain, investor-

---

1. *See* Maryland Code, Public Utilities Article (PUC), § 5–201 (prohibiting a utility from exercising any franchise except to the extent authorized by the PSC); *also Mayor of Berlin v. Delmarva Power,* 95 Md.App. 585, 622 A.2d 763, *cert. denied,* 331 Md. 480, 628 A.2d 1067 (1993). The actual term used to describe the regulated entities is "public service company." For convenience, we shall use the shorter term, "utility."

owned, rather than municipal entities or cooperatives that are owned by their members.

The gas and the electric industries both embrace three basic phases—production, transmission, and distribution—although, because of differences in the commodities themselves, the marketing structure of the two industries has been quite different. Gas, of course, is a natural fuel that must be harvested from where it exists and transported, sometimes over fairly long distances, to its ultimate consumer markets, but it can be stored for future use; it does not need to be produced for immediate consumption in any given market. Electricity, on the other hand, is a manufactured form of energy that traditionally has been generated closer to its consumer market. It cannot be effectively stored for distant future use and so must be generated to meet more immediate anticipated demand.

Most electric companies, throughout the country and in Maryland, have traditionally been vertically integrated and have undertaken, as part of a unitary business, all three operational phases. The electricity that they have sold to ultimate consumers has, for the most part, been electricity that they have generated, transmitted to substations, and then distributed to their customers. *See* Paul L. Joskow and Richard Schmalensee, *Incentive Regulation for Electric Utilities,* 4 YALE J. ON REG. 1, 3 (1986). The gas industry has developed differently. The companies have not been vertically integrated. One company—the producer—extracts the gas and sells it to a pipeline company, which, in turn, transports the gas from the wellhead to local markets and sells it there to large industrial customers for their own use, more recently to brokers or wholesalers, or to a local distribution company which, through its own local distribution network, sells and delivers the gas to the smaller retail consumers in its market area. *See GMC v. Public Service Comm'n,* 87 Md.App. 321, 323–24, 589 A.2d 982, 983–84 (1991).

As noted in *GMC,* efforts at price deregulation in the gas industry began in earnest at the Federal level in 1978, with

the enactment of the Natural Gas Policy Act, 15 U.S.C. § 3301 *et seq.*, in which Congress, with the intent to foster increased exploration and production by allowing market forces to have a greater influence on price, partially deregulated the well-head price of gas. Although some economists and electric utility executives had, by then, begun to question whether the guarded monopoly approach was in need of rethinking in the electric industry as well,[2] legislatures remained, for a time, largely resistant to any major restructuring or deregulation. It was not until 1992 that Congress, through the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776, authorized some restructuring at the wholesale level.

The PSC began working with some of the utilities in Maryland in the early and mid–1990's toward both an anticipated shift from the guarded monopoly regime to a reintroduction of competition and a diversification and expansion of their business activities. In 1995, it authorized natural gas companies to file revised tariffs that would provide customers with access to third-party suppliers and transportation services, thereby allowing some measure of competition into the retail distribution of natural gas. In Case No. 8678, Order No. 72136, *In the matter of Commission's Inquiry Regarding Electric Services, Market Competition, and Regulatory Policies,* 86 Md. PSC 271, 1995 WL 542483 (1995), the Commission noted that the nation's electricity industry was changing as well, that the current system of regulated monopolies was being challenged by competition, and that many issues surrounding that trans-

---

2. *See,* for example, Joskow and Schmalensee, *supra,* at 12–14, raising, in 1986, three concerns over the effectiveness of regulation in the electric utility industry: (1) because regulators often did not have complete information regarding flawed decisions made by the utilities, they were not very good at distinguishing efficient from inefficient behavior; (2) because of that imperfect monitoring, regulation came to approximate pure cost-plus contracts, thereby providing diminished incentives for the utilities to supply electricity efficiently; and (3) average cost pricing led to prices that were sometimes too high and sometimes too low and that, in turn, led to consumption decisions that were socially inefficient. Using historical data, Jarrell came to the conclusion that guarded monopoly regulation had led to higher prices for consumers and greater profits for electric utilities.

formation remained unresolved. *See also* Case No. 8738, Order No. 73834, *In the Matter of Commission's Inquiry into Provision and Regulation of Electric Service,* 88 Md. PSC 549, 1997 WL 808679 (1997).

Some utilities, including Baltimore Gas & Electric Co. (BGE), which supplied both gas and electric service in the central Maryland area, had already begun to diversify their business operations and, through subsidiaries formed for the purpose, move into areas and endeavors that were not intimately related to their core utility services. That diversification raised immediate issues of (1) the extent to which PSC could regulate those activities and subsidiaries, either directly or ancillary to its regulation of the utility operations, and (2) the kind of regulation that was appropriate. The Commission was aware that those issues needed to be addressed in the light of this Court's decision in *C & P v. Maryland/Delaware Cable,* 310 Md. 553, 530 A.2d 734 (1987), in which we concluded that the Commission's jurisdiction over *rates* charged by public service companies was limited to charges for "public utility services," and that rates charged by telephone companies for the use of their utility poles by cable television companies did not fall within the scope of that term.

Some of the issues raised by diversification activities were first addressed in company-specific proceedings involving BGE. In Case No. 8487, a rate case, questions had been raised about the relationship between BGE's regulated utility operations and its merchandise and appliance service activities, as a result of which, in April, 1993, PSC ordered the company to conduct an independent review of its allocation of costs between regulated utility operations and those other activities. *See* Case No. 8487, Order No. 70476, *In the Matter of the Application of Baltimore Gas and Electric Company for Revisions in its Gas and Electric Rates,* 84 Md. PSC 145, 175–77, 1993 WL 667163 (1993). The specific concern was whether the company was using revenue earned from its monopolistic, but regulated, utility operations to subsidize the new diversified enterprises, thus leading to the ratepayers for gas or electric service in effect funding other unregulated

profit-making ventures. Indeed, three months later, PSC received a complaint that BGE was using ratepayer subsidization to support its entry into the kitchen remodeling business. Upon that complaint, PSC instituted an investigation into the cost allocations between regulated and unregulated business activities of BGE. Case No. 8577, Order No. 72107, *In the Matter of the Investigation by the Commission on its own Motion into Allocation of Costs Between Regulated and Unregulated Business Activities of the Baltimore Gas and Electric Company*, 86 Md. PSC 225, 1995 WL 571419 (1995).

In that case, the Commission, noting our decision in *C & P v. Maryland/Delaware Cable*, *supra*, 310 Md. 553, 530 A.2d 734, concluded that, while not all services engaged in by a utility were public utility services subject to PSC regulation, the Commission did have the authority to assure that rates charged for regulated services were not adversely affected by unregulated services and thus to exert authority over unregulated operations "to the extent necessary to assure just and reasonable rates for and the adequate provision of regulated utility services." Case No. 8577, *supra.*

The Commission rejected a proposal that it order a complete structural separation between BGE's utility and non-utility operations, as not being in the public interest, but concluded that certain cost allocation principles were required to prevent unfair cross-subsidization. In that regard, the Commission adopted four standards to be applied with respect to any transactions between BGE's regulated and unregulated operations: (1) a fully-distributed cost allocation methodology be used; (2) both direct and indirect costs be ascertained and included; (3) a fair market value be used for those services provided to the affiliate which could also be marketed to the public; and (4) transfers of *assets* from the utility to the affiliate be recorded at the *greater* of book cost or market value, while transfers from the non-regulated operations to the utility operations be recorded at the *lesser* of book cost or market value. That last standard is known as asymmetrical pricing.

Two other issues relevant here were taken up in Case No. 8577. The Commission staff, the Office of People's Counsel, and one interest group advocated imputation of a royalty to BGE, in the amount of 2% of the gross revenues of its subsidiary, for the "intangible and unquantifiable benefits which the subsidiary receives from the parent company." *Id.* The Commission considered at length the various viewpoints offered on that proposal and, in the end, determined not to adopt a royalty imputation but, instead, to "more completely examine BGE's current cost allocations on an issue by issue basis." *Id.* Finally, it rejected BGE's proposal to transfer its Gas and Appliance Service Department from the company's regulated operations to an unregulated subsidiary, subject to further review.

Issues relating to BGE affiliate relations arose in a subsequent proceeding involving the company's gas operations. In September, 1994, BGE informed PSC of its plan to offer a natural gas brokering service, as an unregulated activity, through a wholly-owned subsidiary, BNG, Inc. The Commission allowed that venture on an interim basis, but in September, 1995, after receiving an interim report and comments thereon from its staff, the Commission opened an inquiry into the matter. Case No. 8709, Order No. 72523, *In the Matter of the Inquiry into Natural Gas Brokering of BNG, Inc., a Subsidiary of Baltimore Gas and Electric Company,* 87 Md. PSC 43 (1996). The inquiry was conducted not as a contested case proceeding but "under a legislative format whereby interested persons would submit written comments, with a legislative-style hearing."

In that proceeding, the Commission again sifted through the various viewpoints, ranging from requiring a complete structural and operational separation of the activity—no shared employees or resources—to allowing the activity with minimal interference. Ultimately, it adopted the four cost allocation standards promulgated in Case No. 8577 and twelve additional standards of conduct, to be followed by BGE in its dealings with BNG. Those standards of conduct, among other things, prohibited joint customer calls and joint promotions by BGE

and BNG, required BGE and BNG to operate from separate locations, and prohibited BGE from providing sales leads to its marketing affiliates, from discriminating in its tariffs or service between affiliates and non-affiliates, from sharing operational and managerial employees with its affiliates, and from giving certain preferences to its affiliates. The net result was a directive to separate BNG's activities from BGE's regulated operations, and to account for all costs and revenues of BNG "below the line"—to place the risk of loss on the company's shareholders and not on the ratepayers for utility services.

These various standards of cost allocation and behavior applied only to BGE, as they were adopted in cases that involved only that company. In November, 1996, People's Counsel requested the Commission to undertake a generic investigation into affiliate transactions of all Maryland gas and electric utilities which, by opening Case No. 8747, the Commission proceeded to do. In this "generic proceeding," the nature of which we shall discuss later, the Commission considered fifteen substantive issues, headed by whether the cost allocation and conduct standards applied to BGE in Case Nos. 8577 and 8709 should be applied to all gas and electric utilities. Case No. 8747, Order No. 74038, *In the Matter of the Investigation by the Commission into Affiliated Standards of Conduct of Companies Providing Gas or Electric Service,* 89 Md. PSC 54 (1998).

In discussing the extent of its jurisdiction over unregulated activities carried on through affiliates of a utility, the Commission drew a distinction between affiliates that duplicated or replaced the essential services formerly provided only by a utility, which the Commission denoted as "core-service affiliates," and those that engaged in activities that were unrelated to the utility's primary function, which were referred to as "non-core-service affiliates." It also noted that two types of protections were at issue—principles governing the allocation of costs between utilities and their affiliates and standards of conduct applicable to utility-affiliate activities. The Commission observed that its traditional role had been to regulate the operations of utilities that provided monopoly services within

defined service territories, that in more recent times, it had worked with utilities to foster consumer choice of service providers within those territories, that the movement from monopoly to provider choice introduced complexities not in existence at the time of this Court's *C & P* decision in 1987, and that the Commission retained a duty to ensure that customers of regulated utilities were protected from price increases or service degradation arising from non-regulated activities of the utilities' affiliates.

In the end, the Commission adopted fourteen standards of conduct that would apply to all electric and gas utilities in transactions with their core-service affiliates and four standards of conduct that would apply in transactions with non core-service affiliates. For the most part, these were the standards that had been applied to BGE in Case Nos. 8577 and 8709. In addition, the Commission extended to all the utilities the directive in Case No. 8709 that:

"[U]nless otherwise directed by the Commission, a utility must place the revenues and expenses of its affiliates both core and non-core below-the-line so that the affiliates' activities will have no impact on utility operations. Further, a utility must identify and separate its affiliates' operational and managerial employees from those of the utility in order to avoid cross-subsidization and to assure fairness in the competitive marketplace. Finally, for those employees and services which can be shared, a utility must identify them and seek Commission approval for such sharing."

Finally, the Commission considered a number of other proposals dealing with utility-affiliate relations. Among other things, it opted, (1) to apply the requirement of timely notification of all new non-regulated activities, (2) to permit utilities to guarantee the indebtedness of their affiliates without charging a fee for that benefit, (3) not to require utilities to file and continually update a cost allocation manual but to require instead a quarterly certification that their cost allocations and transfer pricing of assets comply with the applicable standards of conduct, (4) to preclude utility customers from bearing any of the costs of the utility's non-regulated business activities,

and (5) to place some other restrictions on joint activities between utilities and their affiliates.

These various decisions, including the standards of conduct, became applicable to the gas and electric utilities solely by virtue of their inclusion in the Commission's February, 1998 Order No. 74038. Case No. 8747, *supra.* No attempt was made to embody them in regulations. Indeed, the Commission noted that some of the parties had suggested that any standards adopted by the Commission be in the form of regulations included in the Code of Maryland Regulations (COMAR), but, "because of the time and effort necessary to revise these documents," it rejected that suggestion, observing that "[a]ll utilities subject to this Order are required by the PSC Law to conform with the Commission's directives herein; we do not believe that placing the adopted standards in COMAR or in utility tariffs is necessary to provide additional protection." No formal objection was made by any of the utilities to the adoption of those standards through the device of the order. None of the parties sought judicial review of the order.

While Case No. 8747 was pending, the General Assembly gave recognition to the impending restructuring of the electric utility industry and to the fact that legislation may be needed to implement proceedings of the PSC, and, by 1997 Md. Laws, ch. 106, created a task force to study retail electric competition and restructuring of the industry and report to the General Assembly by December, 1997.

In 1999 and 2000, the Legislature acted on recommendations made by that task force, and, through the enactment of the Electric Customer Choice and Competition Act of 1999, PUC §§ 7–501 to –517 (2001 Supp.), 1999 Md. Laws, chs. 3–4 (the Electric Act), and the Natural Gas Supplier Licensing and Consumer Protection Act of 2000, PUC §§ 7–601 to –607 (2001 Supp.), 2000 Md. Laws, ch. 669 (the Gas Act), provided a legislative basis for shifting away from the 90–year–old guarded monopoly regime back to a competitive approach.

The goals of the Electric Act were stated in legislative findings in PUC § 7–504—to establish customer choice of electricity supply and electricity supply services, to create competitive retail electricity supply and supply service markets, to deregulate the generation, supply, and pricing of electricity, to provide economic benefits for all customer classes, and to ensure compliance with Federal and State environmental standards. The thrust of the Act was to provide some basic legislative standards for the conversion and to give the PSC extensive oversight authority over that process.

Among other things, the PSC was directed to order electric companies to adopt policies and practices designed to prevent discrimination against persons, localities, and classes of service, undue or unreasonable preferences in favor of an electric company's own supply, other services, or affiliates, or any other form of self-dealing or practices that could result in noncompetitive electricity prices to customers (PUC § 7–505(b)(3)). It was also directed (1) to "issue orders or adopt regulations" reasonably designed to ensure the creation of competitive electricity supply and supply service markets, with appropriate customer safeguards (*id.* § 7–505(b)(10)(i)), (2) to require "an appropriate code of conduct between the electric company and an affiliate providing electricity supply and electricity supply services in the State" (*id.* § 7–505(b)(10)(ii)1.), (3) to require "any other safeguards deemed necessary by the Commission to ensure the creation and maintenance of a competitive electricity supply and electricity supply services market" (*id.* § 7–505(b)(10)(ii) 4.), and (4) to require, "among other factors, functional, operational, structural, or legal separation between the electric company's regulated businesses and its nonregulated businesses or nonregulated affiliates" (*id.* § 7–505(b)(10)(iii)).

The Gas Act is somewhat shorter. Under it, the PSC was authorized to license gas suppliers and to adopt consumer protection orders or regulations to protect consumers from discriminatory, unfair, deceptive, and anticompetitive acts and practices in the marketing, selling, or distributing of natural

gas and to provide for contracting, enrollment, and billing practices and procedures.

In July, 1999, following enactment of the Electric Act, the Commission inaugurated Case No. 8820, Order No. 76292, *In the Matter of the Investigation into Affiliated Activities, Promotional Practices, and Codes of Conduct of Regulated Gas and Electric Companies,* 91 Md. PSC 312, 2000 WL 1273724 (2000)—the proceeding that generated this appeal. As with Case No. 8747, this was commenced as a "generic proceeding," in order to address changes taking place in the electric and gas industries and how those changes affected utility-affiliate interactions. In its final order (Order No. 76292), entered a year later (after enactment of the Gas Act), the Commission reviewed some of its prior proceedings, in particular Case No. 8747, and concluded that the standards and limitations adopted in that case, though providing a "good starting point," were in need of some modification. The Commission ultimately adopted seven standards of conduct to govern transactions between utilities and any of their affiliates and seven additional standards of conduct to govern transactions with core-service affiliates. It also extended or imposed certain other prohibitions and limitations.

Believing themselves aggrieved by nearly all departures from the directives adopted in Case No. 8747, the utilities sought judicial review in the Circuit Court for Wicomico County. In addition to raising jurisdictional, Constitutional, and statutory objections to the substance of the Commission's directives, they also urged that the agency order constituted a regulation under the APA and was invalid because the PSC had not complied with some of the statutory requirements for the adoption of a regulation. The court rejected that procedural argument on two grounds, (1) it was not necessary for the PSC to comply with the APA requirements, and (2) the utilities, by knowingly acquiescing in the procedure set by the Commission, were estopped from challenging it in a judicial review proceeding. In a 59–page memorandum and order, the court reversed two aspects of the Commission order, remanded two other aspects to the Commission, but otherwise de-

clared that the order was valid. Not satisfied with that result, the utilities appealed, and because of the importance of the issues presented, we granted *certiorari* prior to proceedings in the Court of Special Appeals.

## DISCUSSION

### Nature Of The Order

As noted, the only issue that we need to address on the merits is the first one raised by the utilities—whether Order No. 76292 constitutes a regulation under the APA and is ineffective by reason of the failure of the PSC to comply with some of the statutory requirements for the adoption of a valid regulation. That issue cannot be considered in a vacuum, however. Whether the Commission's directives constitute a regulation in the first instance, which the PSC denies, depends on what they do, and that needs to be explained, at least in summary fashion. The order does the following things:

(1) It imposes the following seven standards of conduct on transactions between utilities and their affiliates, whether core-service or non-core-service:

(a) Neither a utility nor its affiliate may represent (i) that any advantage accrues to a customer or others in the use of utility services as a result of the customer or other dealing with the affiliate or (ii) that their affiliation allows the affiliate to provide a service superior to that of other suppliers.

(b) If an affiliate's advertising material identifies the affiliate's association with the utility, it must state that the affiliate is "not the same company as the utility" and that its prices are not set by the PSC.

(c) Joint promotions, marketing, and advertising between a utility and an affiliate are prohibited.

(d) A utility may not condition or tie the provision of regulated utility services to any other product or service.

(e) A utility may not give any preference to its affiliate or customers of its affiliate in providing regulated utility services.

(f) With certain exceptions, a utility may not disclose customer-specific information obtained in connection with the provision of regulated utility services absent the informed consent of the customer.

(g) A utility that offers discounts, rebates, fee waivers, penalty waivers, or other special provisions to its affiliate or customers of its affiliate must offer the same benefit to all similarly situated non-affiliated suppliers or their customers.

(2) It imposes the following additional seven standards of conduct in transactions with core-service affiliates (CSA):

(a) Joint sales calls may not be initiated by the utility or a CSA; if a customer requests a joint sales call, it is permitted.

(b) A utility and its CSA must operate from separate locations.

(c) A utility may not provide sales leads to a CSA or appear to speak on behalf of a CSA.

(d) If a utility responds to a customer request for information about competitive core services, the utility must provide a list of all providers of that service and may not highlight or promote its CSA.

(e) A utility must process all requests for service by any provider in the same manner and in the same period of time that it processes requests for service by its CSA.

(f) A utility must apply all terms and conditions of its tariff related to the delivery of energy services without regard to whether the supplier is a CSA.

(g) Any information provided by a utility to an energy marketing affiliate must be disclosed to all non-affiliated suppliers with respect to its system, the marketing or sale of energy to customers or potential customers, or the delivery of energy to or on its system.

(3) It declares, with respect to the transfer of assets between a utility and an affiliate, that (i) the definition of "utility asset" includes intangible and intellectual property, and (ii) asymmetric pricing will govern in such transactions.

(4) It prohibits utilities and their affiliates, both core-service and non-core-service, from sharing operational, managerial, market research, public relations, advertising, customer service, and accounts receivable employees. It also, for the first time, puts limits on the sharing of legal and accounting employees. Accounting personnel may be shared for the purpose of establishing corporate accounting policies and standards, producing consolidated financial and tax statements, and preparing consolidated records or reports. Legal personnel may share responsibilities for OSHA and ERISA compliance or preparation of IRS or SEC filings, but not for contract negotiations or regulatory affairs. Joint costs for shared employees must be allocated on the basis of a fully-distributed cost methodology.

(5) It precludes a utility from lending to, or guaranteeing the debt of, an affiliate if that would create a reasonable likelihood that the utility's cost of capital, credit-worthiness, or ability to provide regulated services will be adversely affected. Loans must be from the utility's retained earnings and must be arranged on an arm's length basis, be at market rates, and contain standard penalties for default. Stockholders, rather than ratepayers, must bear the loss of a default.

(6) It expands the reporting requirements by requiring "most energy utilities" in the State to file periodic Cost Allocation Manuals. Those manuals must embody the four cost allocation procedures adopted in Case No. 8747 and must contain or identify the corporate organization, the location and officers of each corporate entity, an index of operational and managerial employee units of the utility and each affiliate, an index of shared services, methodologies and procedures for cost allocations of service and asset transfers, complete descriptions of all affiliate transactions, of utility services shares with each affiliate, and of all cash management transactions

between a utility and any affiliate involving loans, securities, debt guarantees, or changes in capital structure, and descriptions of employee transfers between a utility and an affiliate.

(7) It exempts affiliates of gas and electric utilities from promotional practice regulations that the Commission had earlier adopted in the form of regulations (COMAR 20.40.01.01–06). Those regulations, on their face, apply to utility affiliates.

(8) It rejects an outright ban on the use of a utility's brand name or logo by affiliates but, in contrast to its decision in Case No. 8747, declares that the use of brand names or logos constitutes the transfer of a valuable asset, requiring that some compensation be paid to the utility (and, indirectly, the ratepayers). In order to implement that provision, the Commission stated that it would docket two separate proceedings—one to determine the appropriate value to be imputed to the utility for the use of the utility's name and logo, and the other to determine the appropriate value for unquantified or other intangible benefits transferred.

(9) With certain exceptions, it adopts for all electric utilities the "GENCO" (Generating Company) Code of Conduct that, in a company-specific case, it had adopted for BGE. GENCO Codes deal with the relationship between a utility and its electric-generating operations. Some electric utilities, such as Potomac Electric Power Company, had decided to divest all or most of their generating assets; others, such as BGE, had decided to keep the generating operations within the corporate family but move them to an affiliate. In the latter case, the Commission was concerned that there be a "level playing field" for electric generation, to assure that customers actually receive the benefits of competition.

In Case Nos. 8794 and 8804, the Commission, as part of an overall settlement agreement, adopted a GENCO Code for BGE that required that, (1) until June, 2006, the BGE GENCO must be operated as a separate subsidiary from BGE and BGE's retail marketing affiliate and it sell all of the generation output of the assets transferred by BGE into the wholesale

market, (2) until June, 2003, the BGE GENCO may not offer power or ancillary services at prices or terms more favorable to an affiliate for resale to retail electric customers in the BGE distribution service territory, and (3) so long as BGE serves as the provider of Standard Offer Service,[3] it may not market or promote its Standard Offer Service. With limited exceptions, the order in this case adopts those principles for all electric utilities having a GENCO affiliate. It requires that a GENCO be a separate subsidiary from the retail marketing affiliate and from the utility until June, 2006, that it may therefore not market the electricity produced from its generation assets, that, except for Standard Offer Service, it must sell all generation output into the wholesale market, and that the utility may not market Standard Offer Service.

### Requirements of the Administrative Procedure Act

Although, as noted, some question was raised in Case No. 8747 as to whether the provisions in the Commission's order should be in the form of regulations, it does not appear that anyone formally raised that issue in this case, at least while the matter was pending before the Commission. It was formally raised for the first time in the judicial review action.

The utilities urge that the PSC has but two ways of declaring policy—through regulations adopted in conformance with the requirements of the APA or through contested case adjudication—and they complain that the policy declared in Order

---

3. Standard Offer Service is a default service, at capped rates, for customers in a utility's service area who are unable or unwilling to choose a new supplier. PUC § 7–510(c), which is part of the section dealing with the phased implementation of customer choice in electric service, states, in relevant part, that "[e]lectricity supply purchased from a customer's electric company is known as standard offer service," that electric companies must offer that service until July, 2003, and that a customer is considered to have chosen that service if the customer, (1) is not allowed to choose an electricity supplier during the phase-in period, (2) contracts for electricity with an electricity supplier but the electricity is not delivered, (3) cannot arrange for electricity from an electricity supplier, (4) does not choose an electricity supplier, or (5) has been denied service or referred to standard offer service by a supplier.

No. 76292 followed neither of those procedures. It emanated from a "generic proceeding," which, they now assert for the first time ever, is a "third" method that is not authorized by any statute and is therefore unlawful. The PSC seems to take the position that policy directives that emanate from generic proceedings need not comply with APA requirements for the adoption of regulations. In so arguing, the PSC misconstrues the reach of a generic proceeding.

When the PSC was first created in 1910, there was no APA. The APA was first enacted in Maryland in 1957. *See* 1957 Md. Laws, ch. 94, codified at Maryland Code (1957), Art. 41, §§ 244–256. It required each "agency" to adopt regulations [4] governing the formal and informal procedures prescribed in the Act but contained relatively minimal requirements regarding the adoption process. Prior to the adoption or amendment of a regulation, the agency was required to (1) publish or otherwise circulate notice of its intended action and afford interested persons an opportunity for input (*id.* § 245(c)), (2) submit the proposed regulation to the Attorney General for approval as to legality, and (3) file copies of adopted regulations with the Clerk of the Court of Appeals, the Secretary of State, and the Department of Legislative Reference (*id.* §§ 9 and 246). The Secretary of State was required to compile, index, and publish all regulations adopted by the various agencies. The only other provision dealing with the adoption process was an authorization for any interested person to file a petition with an agency for the adoption of regulations and a requirement that the agency adopt regulations governing that process. Aside from the requirement in § 9 regarding the

---

4. The initial APA used the terms "rules" and "regulations" almost interchangeably. In more modern parlance, "rules" have come to mean standards or directives governing practice and procedure before the agency, whereas "regulations" deal more with substance—interpretations and regulatory implementations of the statutes administered by the agency. The procedural requirements in the statute do not depend on nomenclature, however. As will be noted, if the agency directive falls within the APA definition of "regulation," it does not matter that it is termed a "rule." Because the current statute uses "regulation" as the defined term, we shall use it as well.

submission of proposed regulations to the Attorney General, none of these requirements applied to the PSC, which was expressly excluded from the definition of "agency" (*id.* § 244).

In 1974, the General Assembly enacted the State Documents Law, the principal purpose of which was to create the *Maryland Register* (Register) as a mechanism for giving public notice of certain agency actions, including the proposed and final adoption of regulations, and COMAR, to serve as a permanent repository of agency regulations. 1974 Md. Laws, ch. 600. In conformance with those purposes, the law required each agency, at least 60 days prior to the adoption of any regulation, to submit three copies of it to the Administrator of the Division of State Documents, who was responsible for publishing the Register and COMAR. One copy was for publication in the Register, and one copy was sent to the Legislative Committee on Administrative, Executive and Legislative Review (AELR Committee). Unless authorized by the AELR Committee, the regulation could not take effect until the expiration of the 60 day period, and it was of no effect unless submitted in accordance with the law. Because the State Documents Law used the APA definition of "agency," that filing and publication requirement did not apply to the PSC.

Until 1978, the only provisions dealing with regulations adopted by the PSC were the requirement in Article 41, § 9, requiring submission of a proposed regulation to the Attorney General, the broad authorization in former Maryland Code (1957, 1975 Supp.), Article 78A, § 64 for the PSC to "make reasonable rules and regulations as it deems necessary to carry out the provisions of this article and any other law relating to the Commission," and § 89 of Article 78A, authorizing an action for declaratory judgment to determine the validity of any regulation adopted by the Commission. In 1978, the Legislature expanded the definition of "agency" for purposes of the State Documents Law in a way that brought the PSC within its ambit. 1978 Md. Laws, ch. 858. In 1984, as part of the enactment of the State Government Article (SG), the State Documents Law provisions were consolidated

with the provisions of the APA dealing with regulations, thereby producing a comprehensive subtitle under the APA dealing with regulations, to which, with some limited exceptions, the PSC was made subject. 1984 Md. Laws, ch. 284. Subsequent amendments, in particular 1985 Md. Laws, ch. 783, greatly expanded those requirements.

The State Government Article, title 10, subtitle 1 (§§ 10–101 through 10–139) is the part of the APA dealing with agency regulations. Section 10–101(g) defines a "regulation," for purposes of the Act, as follows:

"(1) Regulation means a statement or an amendment or repeal of a statement that:

(i) has general application;

(ii) has future effect;

(iii) is adopted by a unit to:

1. detail or carry out a law that the unit administers;

2. govern organization of the unit; or

3. govern the procedure of the unit; and

(iv) is in any form, including:

1. a guideline;

2. a rule;

3. a standard;

4. a statement or interpretation; or

5. a statement of policy.

(2) 'Regulation' does not include:

(i) a statement that:

1. concerns only internal management of the unit; and

2. does not affect directly the rights of the public or the procedures available to the public;

(ii) a response of the unit to a petition for adoption of a regulation, under § 10–123 of this subtitle; or

(iii) a declaratory ruling of the unit as to a regulation, order, or statute, under Subtitle 3 of this title.

(3) 'Regulation,' as used in §§ 10–110 and 10–111.1, means all or any portion of a regulation."

There can be little doubt that many, if not all, of the directives in Order No. 76292 fall within the ambit of that definition. With limited exception, they have general application to all electric and gas utilities and their various affiliates; they have future effect; they were adopted by a "unit"—the PSC—to carry out laws that the PSC administers; they were in the form of statements of policy; and they fall within none of the exceptions stated in SG § 10–101(g)(2). Indeed, as noted, one provision effectively amends an existing COMAR regulation by exempting affiliates from its scope, thereby, on its face, belying the PSC's assertion that its order "did not change existing law."

■ We reject the PSC's unsupported assertion that those directives do not constitute regulations because they address but "one narrow subject matter, utility-affiliate transactions" and are applicable only to non-municipal gas and electric utilities, or because they do not "affect directly the rights of the public." With the exception of the few and relatively small municipal operations, the directives apply to the entire gas and electric industry that the Commission regulates. They have general applicability and are not narrow in scope. Our response to the PSC's suggestion that the directives do not directly affect the rights of the public is two-fold. First, that is not a basis, on its own, for concluding that the directives do not constitute regulations. The exception in § 10–101(g)(2) is for a statement that concerns only internal management of the agency *and* does not affect directly the rights of the public. These directives do not concern only the internal management of the PSC. Even if that were not the case, it is disingenuous even to suggest that the directives do not affect directly the rights of the public. The stated purpose of the order was to protect the rights of the public—to assure both effective competition in the new diversified ventures and that the rate-paying public does not end up subsidiz-

ing those profit-making ventures; every limitation placed on the utilities or their affiliates was for that purpose.

As noted, the current law imposes some significant requirements and conditions on the adoption of regulations by Executive Branch units.[5] *See Dept. of Health v. Chimes*, 343 Md. 336, 339–40, 681 A.2d 484, 485–86 (1996). Section 10–107 requires that the PSC, in particular, submit proposed regulations to its general counsel for approval as to legality and makes clear that any regulation adopted without such submission "is not effective." Although general counsel to the Commission may well have been consulted before and during the generic proceeding that led to Order No. 76292, the record does not indicate whether that order was ever submitted to counsel for an opinion as to legality or that such an opinion was ever rendered.

Section 10–111(a) provides that, except for emergency regulations adopted under § 10–111(b), a unit may not adopt a proposed regulation until (1) after it submits the proposed regulation to the AELR Committee for preliminary review, and (2) at least 45 days after the regulation is first published in the Register. The unit must submit the proposed regulation to the AELR Committee at least 15 days prior to submission to the Register.

The Committee may not veto the proposed regulation but may oppose its adoption. In that event, the unit has three options: it may withdraw the proposed regulation, amend it in accordance with § 10–113 (which essentially requires starting the process anew), or submit the regulation to the Governor with an explanatory statement. In considering whether to oppose a regulation, the AELR Committee must consider whether the regulation (1) is in conformity with the statutory authority of the unit, and (2) reasonably complies with the legislative intent of the statute under which the regulation was promulgated. SG § 10–111.1(b). Section 10–111.1(c) provides

5. "Unit" is the defined term for Executive Branch agencies and officials that are subject to the statutory requirements. For purposes of the regulation-making provisions, the PSC is a unit.

that, upon notice of opposition by the AELR Committee, the Governor may instruct the unit to withdraw the regulation, instruct the unit to modify the regulation, or may approve the regulation. Section 10–111.1(d) specifies that a proposed regulation opposed by the AELR Committee may not be adopted and is not effective unless approved by the Governor.

It is undisputed that the PSC did not submit Order No. 76292, or any part of it, to either the Register for publication or the AELR Committee for its consideration. With an exception not applicable here, § 10–117 provides that the effective date of a regulation is the 10th calendar day after notice of adoption is published in the Register or in COMAR. Neither has yet occurred.

The main arguments of the PSC, aside from its contention that Order No. 76292 does not constitute a regulation, are that (1) by not raising this issue before the Commission, the utilities have waived their right to raise it in a judicial review action, and (2) even if the directives at issue *technically* constitute regulations under SG § 10–101(g), our jurisprudence is to the effect that the Commission is not necessarily obliged to proceed by way of formal regulation-making—that we have approved of the adoption of such policy statements through other means, and that a generic proceeding is a proper alternative method. Both of these responses either focus on or emanate from the device of the generic proceeding.

The Court of Special Appeals commented on this kind of proceeding in *GMC v. Public Service Comm'n, supra,* 87 Md.App. 321, 589 A.2d 982, in which validity of a policy directive adopted in an order terminating a generic proceeding was challenged. The court noted that the jurisdiction of the PSC over public utilities was very broad—that the PSC was authorized to "supervise and regulate" the utilities "to assure their operation in the interest of the public," and that, in implementing that responsibility, it could institute and conduct "any proceedings reasonably necessary and proper to the exercise of any of its powers" and could "initiate and conduct any investigation necessary to the execution of its powers or

the performance if its duties...." *Id.* at 336, 589 A.2d at 989. *See* PUC §§ 2–112, 2–113, and 2–115.

*GMC* involved the rate-setting authority of the Commission, and the court observed that, like its counterparts in the Federal system and in other States, the PSC exercised that authority in several ways—through company-specific proceedings, through the adoption of regulations dealing with such things as accounting systems and billing practices, and through what the PSC has often referred to as a generic proceeding. The court characterized such a proceeding as "[s]omewhat midway" between promulgating regulations and entering orders in case-specific proceedings and noted that it "was often used to institute and conduct an investigation into general areas of concern that may affect more than one public service company." 87 Md.App. at 336, 589 A.2d at 990. The court observed:

"These proceedings are inaugurated by an Order of the Commission which describes the purpose of the proceeding and the procedure to be followed and are terminated by another Order which sets forth the decisions or conclusions reached by the Commission. These may be in the form of recommended legislation ... regulations ... or policy statements or determinations that will be routinely applied thenceforth in all specific proceedings to which they are applicable."

*Id.* at 337, 589 A.2d at 990 (citations omitted).

The *GMC* court noted that the authority of the PSC to conduct generic proceedings had not been challenged in that case and was, in any event, fairly clear. The nature and effect of the order emanating from them, however, was not always so clear. In a subsequent passage, the court observed that the kinds of decisions enunciated in those orders may "have a greater kinship to rules or regulations than to orders entered in company-specific proceedings," and, in that regard, noted, with a touch of warning, that the order at issue arguably constituted a regulation under the APA, in that it had general application and future effect and was adopted by a unit to

carry out a law that the unit administered. The court declined in that case to hold that the order *was* a regulation "because (1) no one has claimed that it is and (2) the record does not establish compliance with a number of the procedural requirements in the Act for the adoption of a valid regulation." *Id.* at 340 n. 3, 589 A.2d at 991 n. 3.

*GMC* accurately identifies the nature of a generic proceeding, which is, and long has been, commonly used by regulatory agencies like the PSC either to investigate some general matter subject to its jurisdiction or to gather facts and opinion in furtherance of its policy-setting function. That function could, in some instances, be carried out through adjudicatory proceedings involving a single utility, but when the matter involves the rights or interests of several utilities, the generic proceeding can be more efficient, in that it allows all interested groups to participate in the policy development at the same time. The generic proceeding is predominantly quasi-legislative, rather than quasi-judicial, in nature. Interested persons, often including persons who may not be directly subject to the jurisdiction of the Commission or to any policy directive that emanates from the proceeding, are invited to participate and to offer data, opinion, and argument. The information is usually provided in the form of either documents or written or oral statements rather than sworn testimony subject to cross-examination. The parties do not ordinarily have the right of "discovery." Such a proceeding would most likely run afoul of some of the procedural requirements applicable to a contested-case proceeding under the APA (which do not apply to the PSC in any event), but it does not, of itself, contradict any of the requirements for the adoption of regulations or for the adoption of policy directives that, for whatever reason, need not be in the form of regulations.

The issue, therefore, is not the validity of a generic proceeding to gather information for the purpose of developing policy but what, if any, conditions are imposed on the adoption and implementation of that policy. Until 1978, when the PSC first became subject to the requirements of the State Documents Law, it did not need to be concerned about any such condi-

tions, other than submitting proposed regulations to the Attorney General for review as to legality, because it was exempt from the APA requirements. With minimal limitations, it could implement policy directives emanating from generic proceedings as it saw fit.

That is no longer the case. Because the PSC *is* now subject to the enlarged and extended regulation-adoption requirements of the APA, it *does* need to be concerned about whether its directives fall within the APA definition of "regulation." As we have indicated, most of the directives included in Order No. 76292 were immediately effective and self-executing, did not depend on further case-specific proceedings, and fall squarely within the APA definition of "regulation." They are not immune from the APA requirements simply because they emanated from a generic proceeding.

We turn, then, to the last two defenses raised by the PSC.

### *Waiver*

The PSC, joined by People's Counsel, notes that, at no time during the proceeding before it did the utilities ever aver that the directives contained in Order No. 76292 constituted regulations or complain that the agency did not follow the APA requirements with respect to them. Citing *Cicala v. Disability Review Bd.*, 288 Md. 254, 418 A.2d 205 (1980) and *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 390 A.2d 1119 (1978), for the proposition that parties seeking judicial review from administrative agency orders may not raise issues in the judicial review action that were not raised before the agency, the PSC asserts that this complaint is therefore untimely and has, in effect, been waived. Quoting from *Cicala*, it urges that a party "who knows or should have known that an administrative agency has committed an error and who, despite an opportunity to do so, fails to object in any way or at any time during the course of the administrative proceeding, may not raise an objection for the first time in a judicial review proceeding." The utilities respond that they "had no reason to assume that the Commission would fail to comply with the

APA *after* the hearings concluded and, absent a duty to speak, no waiver or estoppel exists."

The principle relied upon by the PSC is well-settled (*see*, in addition to *Bulluck* and *Cicala*, *Dept. of Health v. Campbell*, 364 Md. 108, 771 A.2d 1051 (2001), *Insurance Commissioner v. Equitable Life*, 339 Md. 596, 664 A.2d 862 (1995), and *Rockville v. Woodmont C.C.*, 348 Md. 572, 705 A.2d 301 (1998)), and, on this record, the utilities' response at least strains, if it does not entirely rupture, credulity. Most of them had participated in Case No. 8747, where the issue apparently was raised and the PSC specifically declined to follow the APA requirements. The suggestion that sophisticated parties with sophisticated counsel had no reason to assume that the Commission would take the same approach in this case is simply not credible. Nonetheless, there is no waiver, because the principle relied upon by the PSC has no application to actions under PUC § 3–201 seeking a declaratory judgment on the validity of regulations.

The cases in which a waiver has been found based on non-preservation have been in the nature of contested cases, as to which judicial review, either under statutory authority or by way of mandamus, is limited. As we noted in *Bulluck*, 283 Md. at 518–19, 390 A.2d at 1127, quoting from *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946), "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." We do not allow issues to be raised for the first time in actions for judicial review of administrative agency orders entered in contested cases because to do so would allow the court to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency.

A different rule applies with respect to actions for declaratory judgment on the validity of agency regulations, however. PUC § 3–201(a)(1) provides that the validity of a PSC regula-

tion may be determined on a petition for declaratory judgment whenever it appears that the regulation or its application actually or potentially interferes with or impairs the legal rights or privileges of the petitioner. Section 3–201(a)(2) states that a court may render a declaratory judgment in accordance with § 3–201(a)(1) *"whether or not the petitioner has first asked the Commission to determine the validity of the regulation in question."* (Emphasis added).

Section 3–201 is the PUC counterpart to SG § 10–125, which is one of the few provisions of the APA governing the adoption of regulations that does not apply to the PSC. The consistency, however, is noteworthy. As with PUC § 3–201, SG § 10–125 allows a person to file a petition for a declaratory judgment on the validity of any regulation, *whether or not the person has asked the unit to consider the validity of the regulation."* (Emphasis added). Section 10–125(c) obliges a court to declare a provision in a regulation invalid if the court finds that, "(1) the provision violates any provision of the United States or Maryland Constitution; (2) the provision exceeds the statutory authority of the unit; or (3) *the unit failed to comply with statutory requirements for adoption of the provision* " (emphasis added), and, although that language is not expressly stated in PUC § 3–201, it is certainly implicit. One of the utilities that was a party to the PSC proceeding (Delmarva Power & Light Company) filed a petition for declaratory judgment under PUC § 3–201, so the issue was properly before the Circuit Court and is properly before us. There was no waiver.[6]

### Alternative Methods of Adopting Policy Directives

Citing *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 501 A.2d 48 (1985); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 501 A.2d 1307 (1986); *Dept. of Health*

---

6. In noting the italicized statutory provisions, we do not mean to suggest that, in the absence of such a provision, the failure to contest the validity of a regulation before the agency that adopted it would preclude a person aggrieved by the regulation from challenging its validity in court.

*v. Chimes,* 343 Md. 336, 681 A.2d 484 (1996); and *Md. HMO's v. Cost Review,* 356 Md. 581, 741 A.2d 483 (1999), and seeking to distinguish *CBS v. Comptroller,* 319 Md. 687, 575 A.2d 324 (1990), the PSC contends that this Court has generally not required agencies to proceed by regulation when adopting policy and that we ought to follow that approach here as well. The cases relied upon do not support the position advanced by the PSC. They stand merely for the proposition that agencies have some measure of, though not unlimited, freedom to develop and apply standards that interpret or implement statutes that they administer through contested-case adjudications rather than through the adoption of regulations. They do not hold that an agency, through a mechanism other than contested-case adjudication, may adopt standards that constitute regulations under the APA without complying with the APA requirements.

In *Consumer Protection,* the Consumer Protection Division of the Attorney General's Office charged a company that advertised and sold diet pill plans with false and misleading advertising and produced evidence in the contested-case proceeding that the pills had no significant effect in causing weight reduction. The final agency order enjoined the company from making certain representations in its advertising, required certain other statements to be included in that advertising, and directed refunds to Maryland customers who had purchased the product during a certain period. In an action for judicial review of that order, the company argued, among other things, that the advertising practices found misleading by the Division were industry-wide and that, if they were to be prohibited, the Division was required to effect that prohibition by means of a regulation, rather than in a case-specific proceeding.

We rejected that argument on two grounds: first, that the company had not established that the advertising practices were, in fact, industry-wide, and second, that, in any event, agencies are not precluded from announcing new principles in adjudicative proceedings—that the choice between rule-making and adjudication lies, in the first instance, with the agency.

*Consumer Protection, supra,* 304 Md. at 753–54, 501 A.2d at 60. In reaching that second conclusion, we adopted the principle stated in *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947), that, although "[t]he function of filling in the interstices of the [statute] should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future," there was no "rigid requirement to that effect," and the agency "must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective." *Consumer Protection,* 304 Md. at 754, 501 A.2d at 60. It was appropriate, we held, for the Consumer Protection Division to proceed by adjudication, because its directives "did not change existing law or even formulate rules of widespread application" but merely "applied the statutory standards to the facts in the record." *Id.* at 756, 501 A.2d at 61.

A similar argument was made, and rejected, in *Balto. Gas & Elec., supra,* 305 Md. 145, 501 A.2d 1307. Acting under its statutory authority to review fuel rate adjustments proposed by utilities, the PSC, in four case-specific proceedings, adopted certain standards for evaluating applications for such adjustments. One of those standards dealt with assuring the utility's compliance with the statutory mandate that it maintain the productive capacity of its generating plants at a reasonable level. Applying that standard in contested-case proceedings, the PSC disallowed part of the cost sustained by BGE to replace power that was lost when one of its generating plants sustained an outage that the Commission found was preventable. BGE sought judicial review, contending, in part, that the standard was in the nature of a regulation that should have been adopted in conformance with the State Documents Law. As in *Consumer Protection,* we held that the standard was properly applied in an adjudicatory proceeding and did not need to be adopted as a regulation—that the Commission "did not abstractly formulate new rules of binding and universal future effect, but simply articulated the standards through which it interpreted and implemented [the statute] during the

course of specific contested proceedings, as it was required to do by [statute]." *Id.* at 168, 501 A.2d at 1318.

A contrary conclusion, but based on the same reasoning, was reached in *CBS v. Comptroller,* 319 Md. 687, 575 A.2d 324 (1990). The issue there was the implementation of the statutory three-factor formula for apportioning to Maryland the income of a unitary corporation that does business outside the State. One of the factors compared the corporation's total sales with its sales in Maryland. A COMAR regulation adopted by the Comptroller provided that sales, other than sales of tangible personal property, were to be regarded as attributable to Maryland if either the income-producing personal property was in the State or the income-producing activity was performed both in and outside Maryland but more of the activity was performed here than in any other State. CBS, a corporation headquartered in New York, had traditionally apportioned all of its advertising revenue to other States, and the Comptroller had always acceded to that apportionment. In 1980, however, the Comptroller decided to apportion advertising revenue in a new way—based on the percentage of total network audience that was in Maryland—and that changed the sales factor ratio significantly. CBS challenged the new approach, claiming that it should have been accomplished through rule-making rather than through adjudication.

Distinguishing *Consumer Protection* and *Balto. Gas & Elec.,* we agreed that "when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." *CBS, supra,* 319 Md. at 696, 575 A.2d at 328. With respect to the policy change at issue, we concluded that the effect of the Comptroller's audit was "to announce a substantially new generally applicable policy with respect to apportionment of network advertising income of national broadcasting corporations" and that the change, "for practical purposes, amounted to a change in a generally applicable rule." *Id.* at 699, 575 A.2d at 330.

These cases, which all deal with when the application of new standards through the adjudicatory process is permissible, do not assist the PSC here. The PSC may well have been able to formulate and apply the directives embodied in Order No. 76292 in case-specific adjudicatory proceedings, as, in part, it had previously done with respect to BGE, although that issue is not before us. When it chose instead to adopt them through a generic, rather than an adjudicatory, proceeding and then apply them across-the-board to all non-municipal utilities, it made a conscious choice not to use the *Consumer Protection* approach.

In *Chimes, supra,* 343 Md. 336, 681 A.2d 484 and *Md. HMO's, supra,* 356 Md. 581, 741 A.2d 483, we found that certain standards adopted by the respective agencies to implement existing regulations did not, themselves, constitute regulations subject to the APA requirements. In *Chimes,* the Developmental Disabilities Administration had adopted regulations governing the reimbursement of private service providers, one provision of which made clear that the reimbursement formula was subject to the agency's budget appropriations and that the agency could take cost containment measures to control total expenditures. The case arose when, in order to control costs for budgetary reasons, the agency adopted a "growth cap" that had the effect of limiting the reimbursement. A provider sought judicial review, complaining that the growth cap constituted a regulation under the APA. We held otherwise, pointing out that the growth cap applied to a limited number of providers in their capacity as contractors, that it applied "only in a particular program, in a particular year, and in response to a particular budget crisis," and that, as a result, it "was not a rule of widespread application" and did not change existing law. *Chimes, supra,* 343 Md. at 346, 681 A.2d at 489. *Md. HMO's* involved an inflation adjustment system used by the Health Services Cost Review Commission in the implementation of its hospital rate-setting function, which we held did not represent any change in the policies or standards applied by the Commission.

As we have already observed, the PSC directives at issue here do constitute significant changes in policy that affect most of the electric and gas utilities regulated by the Commission. They are precisely the kinds of policy directives that, if not applied in case-specific adjudicatory proceedings, the Legislature intended to be in the form of regulations subject to the APA requirements. Because there was no compliance with those requirements, the directives set forth in Order No. 76292 are simply not effective. Absent some further proceeding by the PSC, there is no need for us or the Circuit Court to address the other issues raised in this appeal.

JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER DECLARATORY JUDGMENT UNDER PUBLIC UTILITIES ARTICLE, § 3–201 THAT DIRECTIVES CONTAINED IN ORDER NO. 76292 ARE INEFFECTIVE FOR THE REASONS STATED IN THIS OPINION; COSTS IN THIS COURT AND IN CIRCUIT COURT TO BE PAID BY PUBLIC SERVICE COMMISSION.