194

PROPERTY OWNERS ASSOCIATION OF BALTI-
MORE CITY, INC., ET AL. *v.* MAYOR AND
CITY COUNCIL OF BALTIMORE ET AL.

[No. 166, September Term, 1972.]

*Decided February 9, 1973.*

The cause was argued before MURPHY, C. J., and
BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Lee N. Sachs,* with whom were *Paul Wartzman* and

*Wartzman, Rombro, Rudd & Omansky, P. A.* on the brief, for appellants.

*John S. Wood, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for Mayor and City Council of Baltimore, part of appellees. *C. Christopher Brown,* with whom was *H. Maxwell Hersch* on the brief, for Northeast Community Organization, Inc., other appellee.

McWILLIAMS, J., delivered the opinion of the Court.

This dispute about water arises out of the conflicting interests of natural adversaries, the landlord and the tenant. The appellee (City), caught between Scylla and Charybdis or, to use the vulgate, between a rock and a hard place, chose not to serve the interests of the landlord, whereupon the landlord, aided and abetted by other landlords, sued to compel a change of heart. The facts require attentive consideration.

The property in the eye of the controversy is in the northernmost part of Baltimore. Known as 1322 Meridene Drive, it is owned by the appellant Piccinini. On 6 September 1971 he leased the property to Paul Frangione who agreed "to pay when due all charges for gas, electricity and *water* . . . ." (Emphasis added.) On 15 September Leader Realty Company, of which Piccinini is president, sent a letter to the Bureau of Water Supply instructing it to bill Frangione the next time the property was billed for water. A photocopy of the lease was enclosed. The lease was returned to Leader Realty with a notice advising "Dear Consumer" that on 25 August 1971 the Board of Estimates had "ruled that the tenant's name would not be placed on the water accounts." Only the property owners' names, the notice added, would appear on the water accounts and the water bills.

There is in the record an excerpt from the minutes of the 25 August meeting of the Board of Estimates indicat-

ing that representatives of the appellee Northeast Community Organization (NCO) had been given a hearing. They sought "a moratorium on water service cut offs," a discussion of who has "the responsibility for payment of water bills" and some explanation of "the City's policy in mailing water bills to tenants" when the payment thereof is the landlord's responsibility. It was said by Mr. Parrish, who heads the Consumer Services Division, that for many years bills had been sent to tenants upon the mere oral request of landlords but that since December (1970) written requests had been required. It seems that the installation of water meters had enabled the City to discard the flat rate charge and to collect for the amount of water actually used. Almost at once, it was said, the landlords tried, by various means, to shift the responsibility for payment to the tenants. Similarly aroused the tenants descended upon City Hall. At the conclusion of the hearing the Board of Estimates directed that, effective immediately, "all bills are to be mailed out in the landlord's name only . . . ."

On 14 October the appellants Piccinini and Property Owner's Association of Baltimore City, Inc. (POA) "representing all persons similarly situated to" Piccinini filed a bill of complaint seeking a declaratory judgment and a writ of mandamus. The lease to Frangione, the request to the Bureau of Water Supply to bill Frangione, and the denial of that request were recited and attached to the bill as exhibits. We have set out in full the appellants' prayer for relief:

"A. A declaratory judgment that:
"(1) Where there is an agreement between the tenant and the landlord (owner) of property in the City of Baltimore, by which agreement the tenant covenants to pay to the City of Baltimore, directly, all charges imposed for water consumption and the availability of water, and where, by proper request, the existence of

said covenant is made known to the Department of Public Works, the said Department of Public Works is required to place the tenant's name on the water account and to mail the bills in the name of the tenant to the address furnished by the party giving notice of said covenant.

"(2) Or, in the alternative, that the action of the Board of Estimates, on August 25, 1971, ruling that the tenant's name would not be placed on water accounts, was arbitrary and capricious and without basis in law.

"B. That a Writ of Mandamus be issued to the Mayor and City Council of Baltimore, Bureau of Consumer Services, directing that, where there is an agreement between the tenant and landlord (owner) of property in the City of Baltimore, by which agreement the tenant covenants to pay to the City of Baltimore, directly, all charges imposed for water consumption and the availability of water, and where, by proper request, the existence of said covenant is made known to the Department of Public Works, the said Department of Public Works is required to place the tenant's name on the water account and to mail the bills in the name of the tenant to the address furnished by the party giving notice of said covenant."

The City and NCO, which was permitted to intervene, both answered the bill of complaint and the case came on to be heard before the chancellor, Prendergast, J., on 19 June 1972. The stipulation which follows was offered by counsel for the appellants and it was received without objection.

"(Mr. Sachs) I would like to proffer or state the facts upon which we have agreed. If the Court accepts that statement of facts, our purpose here today will be primarily argument.

198

"The case arises from an action of the Board of Estimates on August 25, 1971. The intervenor defendant has subpoenaed a copy of the minutes of that meeting and they make up part of the file in this case.

"The issue, very simply stated, is this. Where there is a contractual agreement between the landlord and the tenant, with respect to residential property, that the tenants pay the water bill. Up until August of 1971, upon notice from the landlord, the Bureau of Consumer Services of the city, would send the water bill to the tenant in the mail. Since the meeting of August 25, 1971, the Consumer Services Division has been directed, and has implemented this policy, that no water bills are sent to anybody but the owner of the property, so that in all cases, the water bills are sent to the owner, notwithstanding the fact there is, at least in the cases on the factual situations which are here, notwithstanding the fact there is a written agreement between the landlord and the tenant for the tenant to pay the water bill, and the bill of complaint has certain exhibits attached to it which was in effect a test case wherein a lease was signed between landlord and tenant, and the landlord wrote to the Department of Consumer Services asking the bills be sent to the tenant, as has been the policy for as many years as we can determine, prior to August of 1971, and a response was received, saying that the Board of Estimates had instructed them not to send any bills other than to the landlord. So, that is the issue on which we are before the court and it has been as to the facts stipulated to by the counsel for the defendant, and the intervenor defendant."

The City introduced in evidence a printed form en-

titled "Application for Water Supply Service." It provides, in part:

> "To: City of Baltimore
> Bureau of Water Supply
>
> "Subject to all the rules and regulations of the Bureau of Water Supply *and the Board of Estimates* and to the ordinances of the Mayor and City Council of Baltimore City, and particularly relating to water services, the undersigned hereby make application for the installation of . .    . water supply service(s) to . . . . . . . . .    . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> "The undersigned *owner* of the above property or properties hereby *agrees to pay* to the Mayor and City Council of Baltimore the necessary installation charges and *all charges for the use of water* at the above property or properties as regulated by law until service is discontinued by formal application to disconnect the water supply service(s) at the main. . . . .
>
> * * *
>
> "The terms and conditions of this application are binding upon the *undersigned owner* and all succeeding owners." (Emphasis added.)

We understand, and it appears to be conceded, that applications are accepted only from the owner of the property and that the application must be signed by the owner or his agent.

The appellants, we think, have ranged rather far afield. The chancellor said they argued that "the City has a firm and unqualified obligation to supply water to any and all applicants" and they seem to have persuaded him that the only issue in the case was "whether the City's refusal to honor applications indiscriminately rather than from property owners only, is reasonable." They range at least as far afield, perhaps farther, in their ar-

gument here. As they put it to us, "the supply of water is a contractual arrangement" the parties to which are the City and the consumer; and since the consumer is the tenant the bill should be sent to him. To refuse to do so, they conclude, is arbitrary, unreasonable and illegal. They seem to have lost sight of the fact that we do not give advisory opinions, we just decide the cases that come to us and both the bill of complaint and the prayer for relief, *supra*, demonstrate the unequivocal character of the facts of the case they have brought to us.

That Piccinini is the owner of the property is entirely clear. Somewhat less clear is whether he signed and filed with the Bureau of Water Supply the Application for Water Supply Service. However, he does not deny it and, as we have said, it appears to be conceded that the application would not have been received from any person other than the owner. Of course, the application might have been submitted by his predecessor in title but, being in the real estate business, Piccinini would have known that "the terms and conditions" were "binding" upon him. Moreover, it is hardly likely he would have written the letter instructing the Bureau to bill Frangione had he harbored any notion that the terms of the application were not binding upon him. We think we are bound to assume that he stood in the shoes of an owner who had signed and filed the application *before* he leased the property to Frangione. It is not suggested that Frangione either applied for or was refused service; nor is it suggested that he ever refused to pay the water bill.

As we see it the contracting parties were Piccinini and the City. There is not the slightest indication that he was coerced into assuming the obligations of the contract and the citation of a clutch of authorities is hardly necessary to support a holding that he could not assign his liability to Frangione. Sufficient for that purpose is *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 598, 128 A. 280 (1925).

The appellants have cited cases [1] which seem to support their position but, in our judgment, their relevance does not survive close inspection. The Charter of Baltimore City (1964 Revision), Art. II, Sec. (45), gives the City the power "to establish, operate, maintain, regulate and control a system of water supply and to make charges for the consumption or use of such water . . . [and] to turn off and discontinue the supply . . . because of the non-payment of any . . . charge for water . . . ." Baltimore City Code (1966 Ed.), Art. 29, Sec. 9 (in force since 1879), declares that a bill in arrears "may be deemed a sufficient reason for discontinuing water service until all arrearages are paid . . . [and] the owners of property will in all cases be held responsible for the payment of water bills." Chapter VII, Sec. 704, of the Housing Code of Baltimore City, Ordinance 902 (1966), provides that:

"No owner, operator or occupant shall cause any service, facility, equipment or utility which is required to be supplied under this Code to be removed from or shut off from or discontinued for any occupied dwelling let or occupied by him . . . ."

Regulation 1, *Water Supply,* adopted to implement Sec. 704, *supra,* requires

"[t]he owner of every occupied dwelling . . . [to] be responsible for maintaining an ade-

1. MacBride v. Gulbro, Adm'x, 247 Md. 727, 234 A. 2d 586 (1967); Home Owners' Loan Corp. v. Mayor and City Council, 175 Md. 676, 3 A. 2d 747 (1939); Lutz v. State, 167 Md. 12, 172 A. 354 (1934); Mayor and City Council v. Tickner, 141 Md. 148, 118 A. 136 (1922); People ex rel. Brockamp v. Schlitz Brewing Co., 261 Ill. 22, 103 N. E. 555 (1913); Consolidation Coal Co. v. Zarvis, 222 Ky. 238, 300 S. W. 615, 58 A.L.R. 1430 (1927); State ex rel. Milsted v. Butte City Water Co., 18 Mont. 199, 44 Pac. 966 (1896); Bea v. Turner & Co., 115 N. J. Eq. 189, 169 A. 832 (1934); City of New York v. Idlewild Beach Co., 43 N.Y.S. 2d 567, 182 Misc. 205 (1943), aff'd 50 N.Y.S.2d 341, 182 Misc. 213 (1944); Farmer v. Mayor and City Council of Nashville, 127 Tenn. 509, 156 S. W. 189 (1913); Waldron v. International Water Co., 95 Vt. 135, 112 A. 219 (1921).

quate, continuous supply of water to all plumbing fixtures in the dwelling regardless of any agreement between owner and tenant concerning the payment of water and sewer charges."

We are not persuaded that there is anything unreasonable in the City's election to deal with the owner rather than with the tenant. Nor do we see any merit in the argument that this operates to discriminate against the tenant. Every property is owned by someone and every tenant is beholden to some owner who must (Regulation 1, *supra*) "be responsible for maintaining [for his tenant] an adequate, continuous supply of water." It is very likely true that landlords have found water to be a touchy subject and that making tenants pay for it is a perennial nuisance but because for some years they have been able to persuade the City to bear the odium and expense of dealing with tenants is no reason why the City cannot now say, "Hold, enough!" and stand from under. We think the chancellor reached the right result.

*Affirmed with costs.*