825 A.2d 462

PUBLIC SERVICE COMMISSION OF MARYLAND, et al.,

v.

PANDA–BRANDYWINE, L.P.

No. 92, Sept. Term, 2002.

Court of Appeals of Maryland.

June 10, 2003.

See also 99 F.Supp.2d 681.

Kenneth M. Simon (Mark H. Kolman, Woody N. Peterson of Dickstein, Shapiro, Morin & Oshinsky LLP, Washington D.C.), Miles H. Mitchell (Susan Stevens Miller of Office of General Counsel, Baltimore); (Michael J. Travieso, Richard T. Miller of Office of People's Counsel, Baltimore), all on brief for petitioners/cross–respondents.

Roger W. Titus (Mitchell Y. Mirviss and Samantha M. Williams of Venable, Baetjer and Howard, LLP, Rockville); Kenneth G. Hurwitz (Haynes and Boone, LLP, Washington, D.C.), all on brief for respondent/cross–petitioner.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

This case arises from the maelstrom accompanying the restructuring of the electric industry in Maryland. Although it is an appeal by the Maryland Public Service Commission (PSC) from a judgment of the Circuit Court for Montgomery County reversing one of its administrative decisions, the prin-

cipal parties in interest are Potomac Electric Power Company (PEPCO), Panda–Brandywine, L.P. (Panda), and Southern Energy, Inc. (SEI). The issue presented to the PSC was whether certain provisions in an Asset Purchase and Sale Agreement (APSA) between PEPCO and SEI caused that agreement to contravene an anti-assignment clause in an earlier power purchase agreement (PPA) that PEPCO had with Panda.

The PSC entered an order declaring that the APSA did not violate the anti-assignment provision of the PPA and that Panda's consent to the APSA was therefore not required. The Circuit Court, in an action by Panda for judicial review of the PSC order, disagreed with the PSC's conclusion that there was no violation of the anti-assignment provision. It found that the disputed provisions in the APSA *did* constitute an assignment of rights and obligations under the PPA and that, absent Panda's consent, it was impermissible.

The Court of Special Appeals, upon the PSC's and PEPCO's appeal, agreed that those provisions—Schedule 2.4 of the APSA—constituted an assignment or delegation in contravention of the PPA. It concluded, however, that the PSC has the authority, on public policy grounds, to "validate transactions that violate anti-assignment provisions that would entitle the complaining party to assert a cause of action under Maryland contract law," and it directed that the case be remanded to the PSC for a determination whether, on purely public policy grounds, the APSA should be validated notwithstanding the anti-assignment violation.

We granted cross-petitions for *certiorari* to review the judgment of the Court of Special Appeals. We agree with the intermediate appellate court, and the Circuit Court, that Schedule 2.4 of the APSA violates the anti-assignment provisions of the PPA. We shall vacate, however, that part of the judgment directing a remand to the PSC. The issue of whether the PSC has any authority to validate the APSA on public policy grounds was not raised in the administrative

proceeding and should not have been injected into the case by the Court of Special Appeals.

## BACKGROUND

PEPCO is an electric utility serving the metropolitan Washington, D.C. area. Panda is a "qualified facility" (QF) under the Public Utility Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. § 2601 *et seq.*). It has that status because it is a "qualifying cogeneration facility" that produces electricity and steam or other useful energy for industrial, commercial, cooling, or heating processes and because it conforms with regulations promulgated by the Federal Energy Regulatory Commission (FERC). *See* 16 U.S.C. § 796(18)(B).

As part of its effort to provide for increased conservation of electric energy and increased efficiency in the use of facilities and resources by electric utilities, Congress directed in § 210 of PURPA (16 U.S.C. § 824a–3) that FERC adopt regulations to encourage cogeneration production and specified that those regulations require electric utilities to purchase electric energy from qualified facilities. Dutifully, FERC adopted such regulations. *See* 18 CFR § 292.303, requiring electric utilities to purchase any energy and capacity made available from a QF either directly or indirectly to the utility.[1] The regulations require the utility to make any interconnections with a QF that are necessary to accomplish the purchase. *Id.* § 292.303(c)(1).

In August, 1991, PEPCO and Panda entered into a PPA calling for (1) the construction by Panda of a new 230–megawatt cogenerating power plant in Prince George's County, (2) connection of the facility to PEPCO's high voltage transmission system by transmission facilities to be built by Panda but later transferred without cost to PEPCO, and (3)

---

1. Section 292.303(d), dealing with indirect purchases, provides that, "[i] f a qualifying facility agrees, an electric utility which would otherwise be obligated to purchase energy or capacity from such qualifying facility may transmit the energy or capacity to any other electric utility." (Emphasis added).

upon commencement of the commercial operation of the plant, for PEPCO to purchase the power generated by that plant for a period of 25 years. The plant was built at a cost of $215 million, financed mostly through loans.

The PPA is 113 pages in length, single-spaced, and is both detailed and complex. In it, PEPCO was given substantial authority to review, influence, and, in some instances, determine important aspects of both the construction and operation of the Panda facility. Among other things, PEPCO had the right: (1) to review the design of the facility and monitor its construction, start-up, testing, and operation (§ 7.1(e)); (2) to review and approve certain performance standards for the generators (§ 7.1(g)); and (3) to review and approve Panda's selection of the operator of the facility and the terms and conditions of any operation and maintenance agreement entered into by Panda with respect to the facility (§ 8.1(e)). In addition, PEPCO had the right to appoint one of the two members of an operating committee charged with developing policies and procedures regarding operations, maintenance, outage and capability reporting, accounting, and record keeping, except that PEPCO reserved sole discretion over procedures pertaining to the interconnection of the facility to the PEPCO system and the operation of the facility in a parallel mode with the PEPCO system (§§ 8.10 and 7.1(h)). It had an option to purchase Panda's interest in the facility at fair market value in the event Panda desired to sell and had not received a bona fide offer, and it had a right of first refusal to purchase an interest in Panda itself (§§ 18.1 and 18.3).

The plant was to have a Dependable Capacity of 230 megawatts, which was divided, for operational purposes, into two categories—a Limited Dispatch Portion of 90 megawatts and a Dispatchable Portion of 140 megawatts. Under the initial agreement, PEPCO was obliged to purchase the entire Dependable Capacity of the facility (§ 5.1), but it had substantial control over when during the day or week the Dispatchable Portion was to be delivered and some control over when the Limited Dispatch Portion was to be delivered (§ 8.3).

Section 19.1 of the PPA provided, with certain exceptions not relevant here, that "[n]either this Agreement, nor any of the rights or obligations hereunder, may be assigned, transferred, or delegated by either Party, without the express prior written consent of the other Party, which consent shall not be unreasonably withheld. . . ." We are informed, without contradiction by the PSC or PEPCO, that Panda's loan documents require Panda to obtain the consent of its lenders to any assignment, transfer, or delegation under § 19.1.

Panda's facility commenced commercial operation in November, 1996, but, during the first four years, the Dispatchable Portion remained idle for extended periods, and various claims and disputes arose between the parties. On October 24, 1997, Panda and PEPCO resolved those disputes through a letter agreement, one feature of which was an agreement by PEPCO to release to Panda on a periodic basis, through 2002, the right to sell energy from the facility to others, *i.e.*, not to insist on Panda supplying all of the Dependable Capacity to PEPCO. The letter agreement stated, in that regard, that PEPCO would base those releases on its projections of facility operations to serve PEPCO loads—that is, on its estimate of its own needs.

The initial PPA was submitted to and approved by the PSC. *See* 83 Md. P.S.C. 191, 1992 WL 527167 (1992). The parties concluded that the letter agreement did not require PSC approval and apparently did not submit it for such approval.

In 1999, the General Assembly passed the Electric Consumer Choice and Competition Act of 1999 (Md.Code, §§ 7–501 through 7–517 of the Public Utility Companies Article), calling for the restructuring of the electric industry in an effort to promote competition in the generation and delivery of electricity, and, in that Act, it directed the PSC to oversee that restructuring. In furtherance of that role, the PSC directed the electric utilities in the State to submit plans for the restructuring of their operations. *See Delmarva Power v. PSC*, 370 Md. 1, 803 A.2d 460 (2002). PEPCO's proposed restructuring involved a complete divestiture of its electric

generating assets and its various PPAs, to be accomplished by an auction. That proposal was submitted to the PSC as part of an overall settlement agreement, and, by order entered December 22, 1999, it was approved. *See In the Matter of Potomac Electric Power Company*, Md. PSC Case No. 8796, Order No. 75850, 198 P.U.R. 4th 1, 1999 WL 1334719 (1999). The order noted that the auction sale would include PPAs unless PEPCO determined either that the value received would be significantly less if those agreements were included or that "it is not legally free to auction purchased power contracts."

The sale to the winning bidder was to be accomplished by an Asset Purchase and Sale Agreement (APSA) that included a number of PPAs to which PEPCO was a party and specifically the PPA with Panda. Recognizing that some of the contracts intended to be assigned under the APSA may contain anti-assignment clauses, requiring the consent of a third party, PEPCO inserted provisions dealing with that eventuality. Section 2.4(b) of the APSA stated that, if PEPCO was unable to obtain a consent from a Power Seller to an assignment of a PPA, the PPA was to be governed by Schedule 2.4, attached to the APSA. Schedule 2.4 was applicable to all PPAs not assigned to the buyer on the closing date. It stated, in § II.B., that PEPCO agreed to sell to the buyer "all capacity, energy, ancillary services and other benefits" under the unassigned PPA and that the buyer would pay to PEPCO all amounts due from PEPCO to the Power Seller.

Section D of Schedule 2.4, which is the provision most at issue in this case, is captioned "Administration" and provides, in relevant part, that:

(1) As of the Closing Date, PEPCO would irrevocably and unconditionally appoint the buyer as its exclusive representative and agent "for all purposes to the fullest extent permitted under the Unassigned PPAs except with respect to the Retained Rights." [2]

---

**2.** Retained rights were defined in the Schedule as (1) PEPCO's rights and obligations under (i) each PPA relating to the interconnection of a

(2) Except as to the Retained Rights, the buyer was authorized to take all actions that PEPCO could lawfully take under the PPA without further approval from PEPCO, including:

(i) dealing directly with Panda and others with respect to all matters arising under the PPA;

(ii) acting on PEPCO's behalf in the prosecution or defense of all rights or liabilities under the PPA;

(iii) monitoring Panda's performance under the PPA;

(iv) reviewing and auditing all bills and related documentation rendered by Panda; and

(v) with certain limitations, entering into amendments of the PPA.

(3) The buyer could delegate to its affiliates or third parties any of its responsibilities under Section D.

Upon PSC approval of the auction proposal, negotiations of some sort commenced between PEPCO and Panda, but they were not fruitful, and each party now blames the other for the failure. The auction date was set for May 31, 2000. In April, 2000, PEPCO filed an action in the United States District Court for the District of Maryland in which, among other claims, it sought a declaratory judgment that Panda was not properly a QF because it did not comply with FERC regulations. The court dismissed the complaint, largely on PEPCO's failure to exhaust administrative remedies, and no appeal was taken. *See Potomac Elec. Power Co. v. Panda Brandywine, L.P.,* 99 F.Supp.2d 681 (D.Md.2000).[3]

Panda, in turn, one day before final bids were due on the auction, filed a motion with the PSC to postpone the auction,

Power Seller's facilities to PEPCO's electric transmission facilities and (ii) the Panda PPA relating to the transmission facilities, and (2) all claims, causes of action, rights of recovery, and rights of set-off in favor of PEPCO arising prior to the Closing Date, including all rights in the Panda litigation.

3. Under § 6.3(a) of the PPA, PEPCO was entitled to terminate the PPA if Panda were to lose its QF status, although there was a minimum lead time of 18 months before the termination could take effect.

at least with respect to its PPA, and to direct PEPCO to enter into good faith negotiations regarding the conditions under which Panda would consent to the inclusion of its PPA in the auction. That submission presumably was pursuant to § 17.2(a) of the PPA, which provided that, if the parties were unable to resolve any dispute arising under the agreement, they would submit the dispute to the PSC for expedited resolution before pursuing any other available rights or remedies. PEPCO responded, in part, with a motion for a Declaratory Order that the proposed auction agreement would not constitute an assignment of the PPA and, for that reason, did not require Panda's consent.

While the matter was pending before the PSC, the auction proceeded, and, on June 7, 2000, SEI was declared the winning bidder. On September 27, 2000, the PSC entered an order (Order No. 76472) declaring, among other things, that the provisions in the APSA did not constitute an assignment or transfer within the meaning of § 19.1 of the Panda PPA, that PEPCO was not assigning "significant obligations and rights under the PPA," that Panda would not be harmed by the transaction, and that the APSA did not "fundamentally alter[ ]" the privity of contract between Panda and PEPCO. It thus concluded that Panda's consent to the proposed APSA was not required. In conformity with those findings, the PSC denied all relief sought by Panda. To some extent, the PSC's conclusions rested on a decision of FERC in *New England Power Company, et al.*, 82 F.E.R.C. ¶ 61,179, 1998 WL 89673, *reh'g denied*, 83 F.E.R.C. ¶ 61,275, 1998 WL 385144 (1998).

Panda sought judicial review in the Circuit Court for Montgomery County. That court found that the APSA was not merely a resale or "back to back" agreement, as averred by PEPCO and found by the PSC, but, with the provisions in § D of Schedule 2.4, effected an assignment of Panda's PPA. It reversed the PSC order and remanded for further proceedings, although it did not specify the kind of proceedings it anticipated or what further issues PSC would need to resolve.

While the judicial review action was pending, PEPCO sought approval of the APSA from FERC, which, under § 203 of the Federal Power Act (16 U.S.C. § 824b(a)) must approve such a transaction if it finds that the disposition will be consistent with the public interest. In making that determination, FERC considers three things: effect on competition, effect on rates, and effect on regulation. Panda intervened in the proceeding and asked that FERC either reject Schedule 2.4 as unjust and unreasonable or suspend it and set the issue for hearing. Panda argued that the proposed transfer would alter its bargained-for risks in that, as SEI is a direct competitor, it could restrict the releases of energy under the 1997 letter agreement, thereby depriving Panda of significant economic benefits.

FERC approved the transaction. With respect to Panda's opposition, it agreed with PEPCO's position that PEPCO would remain the purchaser and would not be transferring its rights and obligations. FERC concluded that "[s]ince PEPCO will remain the purchaser under the proposed transactions for the unassigned PPAs, Panda's concerns are misplaced." FERC did not address, in any specific way, the effect of the various designations and delegations under § 19.1 of the PPA. *See Potomac Electric Power Company, et al.*, 93 F.E.R.C. ¶ 61,240, 2000 WL 1828412 (2000).

Aggrieved by the decision of the Circuit Court, PEPCO appealed to the Court of Special Appeals. That court viewed the issue as one of contract interpretation, which was an issue of law. The intermediate appellate court concluded that, through the APSA, PEPCO effectively and improperly delegated its duties under the PPA to SEI. It added that the APSA amounted to an assignment because it extinguished PEPCO's right to performance from Panda—a right that was transferred to SEI. The court viewed the FERC decisions relied on by the PSC as public policy decisions and agreed that both FERC and PSC have the authority, on public policy grounds, to validate transactions such as the APSA notwithstanding that they violate anti-assignment provisions. Its ultimate holding was that, although the PSC could approve the

APSA on grounds of public policy, it could not approve the transaction on the ground that it did not violate the anti-assignment clause of § 19.1 of the PPA.

We granted cross-petitions for *certiorari* to consider whether the Court of Special Appeals erred (1) in concluding that Schedule 2.4 of APSA effected an assignment of rights and obligations under the PPA in violation of § 19.1 of the PPA, and (2) in concluding that the PSC had authority to validate APSA on public policy grounds even though it constituted a violation of the PPA.

## DISCUSSION

### Contract Interpretation

Both parties agree that the assignment issue is one of contract interpretation. The PSC and PEPCO present the question as whether the APSA constitutes an assignment or delegation of the PPA that requires Panda's consent and urge that, "[t]o answer that question, the Court need only apply the traditional principles of contract construction and interpretation to the PPA and the APSA." Principally, the PSC and PEPCO focus on ¶ II.B. of Schedule 2.4, which calls for PEPCO to sell and SEI to purchase all of the power that PEPCO purchases from Panda, and thus regard the entire APSA as a "back to back" resell agreement and nothing more. They treat the APSA arrangement as equivalent to an automobile dealer reselling a car that it has purchased from a manufacturer to a consumer.

Panda retorts that one cannot look just at ¶ II.B. but must consider the APSA as a whole. It focuses on ¶ II.D.—the Administration provision—as the source of the improper assignment and delegation. In response, the PSC and PEPCO point out that the irrevocable and unconditional appointment of SEI as PEPCO's agent for all purposes is "to the fullest extent permitted under the Unassigned PPAs" and that any delegation by PEPCO is thus limited by, and therefore cannot exceed, what is permitted by the PPA. The PSC and PEPCO further maintain that SEI is merely PEPCO's agent, that

PEPCO remains fully liable to Panda for SEI's performance, and that, as a result, there was no assignment of either rights or obligations. Panda views the first of these arguments as "nonsensical" and the second as "gimmickry."

In addressing these various positions, we need to start, and end, with the relevant language in the two contracts— § 19.1 of the PPA and § 2.4 and Schedule 2.4 of the APSA. Section 19.1 states clearly that "[n]either this Agreement, nor any of the rights or obligations hereunder, may be assigned, transferred, or delegated by either Party, without the express prior written consent of the other Party, which consent shall not be unreasonably withheld." Neither the PSC nor PEPCO has ever contested the validity of that provision; nor have they claimed that the provision is in any way ambiguous or against public policy, or that PEPCO has ever received consent from Panda to the APSA.

By prohibiting both non-consensual assignment and delegation, the PPA recognizes a nuance, or distinction, that is occasionally overlooked. In a bilateral contract, each party ordinarily has both rights and duties—the right to expect performance from the other party to the contract and the duty to perform what the party has agreed to perform. Although both are often the subject of transfer, the law does distinguish between them, using the term "assignment" to refer to the transfer of contractual rights and the term "delegation" to refer to the transfer of contractual duties. The basic rules are well-stated in the RESTATEMENT (SECOND) OF CONTRACTS §§ 317–323 (1981).

RESTATEMENT § 317 defines the assignment of a right as "a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Section 317(2) permits a contractual right to be assigned unless (a) "the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or

materially impair his chance of obtaining return performance, or materially reduce its value to him," (b) the assignment is forbidden by statute or is inoperative on grounds of public policy, or (c) "*assignment is validly precluded by contract.*" (Emphasis added).

Section 318 speaks to the delegation of performance. Section 318(1) allows an obligor to delegate the performance of a contractual duty "unless the delegation is contrary to public policy *or the terms of his promise.*" (Emphasis added). Section 318(2) provides that, unless otherwise agreed, a promise requires performance by a particular person "only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised." Finally, § 318(3) states that, "unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."

Although using somewhat different language, we have adopted those principles. In *Macke Co. v. Pizza of Gaithersburg*, 259 Md. 479, 482, 270 A.2d 645, 646–47 (1970), we held that "[i]n the absence of a contrary provision . . . rights and duties under an executory bilateral contract may be assigned and delegated, subject to the exception that duties under a contract to provide personal services may never be delegated, nor rights be assigned under a contract where *delectus personae* was an ingredient of the bargain."[4]

These general statements, both in §§ 317 and 318 and in *Macke* regarding the extent to which rights may be assigned and duties of performance may be delegated are, as noted, subject to any valid contractual provision prohibiting

---

4. As it is no longer necessary or fashionable to clutter legal writing with Latin terms that few people understand, we explain that "delectus personae," literally "choice of the person," refers to the rule that "when personal relations are important, a person cannot be compelled to associate with another person," which, in turn, is based on the principle that "a partner has the right to accept or reject a candidate proposed as a new partner." BLACK's LAW DICTIONARY at 438 (7th ed.1999).

assignment or delegation. Section 19.1 of the PPA very clearly prohibits both the assignment of rights and the delegation of duties of performance, absent express written consent. The issue, then, is not whether PEPCO can make such an assignment or delegation but only whether it has, in fact, done so. The answer to that lies in the effect that the so-called "agency" provisions of Schedule 2.4D have on the contractual relationship between PEPCO and Panda.

■ As we observed, in Schedule 2.4D, PEPCO *irrevocably and unconditionally* appointed SEI as its exclusive agent *for all purposes* and to the fullest extent allowed by the PPA. SEI was expressly authorized to take all actions that PEPCO could lawfully take under the PPA, without further approval by PEPCO, including the right to perform all obligations of PEPCO in respect to the PPA, to deal directly with Panda "with respect to all matters arising under the ... PPA," to "monitor [Panda's] performance" under the PPA, to review and audit all bills and related documentation rendered by Panda, with some restrictions to enter into amendments to the PPA, and to delegate any or all of those functions to any third party.

Whether or not that provision transfers to SEI PEPCO's right to purchase power from Panda, it certainly has the effect of transferring to SEI, unconditionally, irrevocably, and without any monitoring or control by PEPCO, PEPCO's right under § 7.1(e) of the PPA to monitor the operation of Panda's facility, to designate (under § 8.10) PEPCO's representative on the two-person operating committee charged with developing policies and procedures regarding operations, maintenance, outage and capability reporting, accounting, and record keeping, and, under § 8.1(e), to approve the selection of the operator of Panda's facility and the terms and conditions of any operation and maintenance agreement entered into by Panda. Of considerable consequence to Panda as well, at least through the year 2002, Schedule 2.4D permitted SEI, rather than PEPCO, to determine how much of Panda's output it could sell on the open market pursuant to the 1997 letter

agreement. That agreement called for the release to Panda to be determined by PEPCO based on "PEPCO's projections of facility operation to serve PEPCO loads, including projections of the PJM Pool interchange deliveries."[5] By virtue of Schedule 2.4D, SEI would make that determination, based on *its* needs. Unquestionably, the overall effect of Schedule 2.4D makes the APSA far more than just a "back to back" resell agreement. It gives SEI a substantial measure of control over Panda's operations.

In *Crane Etc. Co. v. Terminal Etc. Co.*, 147 Md. 588, 128 A. 280 (1925), we examined whether, even in the absence of an anti-assignment provision, it was permissible to transfer to a third person contractual rights and obligations that would have the effect of altering the nature of the agreement contemplated by the parties to the contract. The contract in question required Terminal, an ice-making company, to deliver to Frederick, an ice cream maker, whatever quantities of ice Frederick needed in its business, up to 250 tons a week, for a set price, the ice to be delivered to Frederick's loading dock. Frederick, in turn, agreed not to purchase ice from any other supplier, except amounts in excess of the 250 tons. The contract was initially for a three-year term but was renewed for an additional three years. When, during the renewal term, Frederick sold its business to Crane, a larger company headquartered in Philadelphia, the question arose whether its contract with Terminal was assignable.

Even without an anti-assignment clause, this Court concluded that it was not assignable. The rights and duties under the contract, even though of a business nature between two corporations, were too personal. Subject to the 250–ton maximum, Terminal agreed to supply all of Frederick's needs. The character, credit, and resources of Frederick had been tested and established before the contract was renewed. The inducement for Terminal to agree to the arrangement, we concluded,

---

5. The PJM Pool was defined in § 1.71 of the PPA as the power pool comprised of various electric utility systems in the Mid–Atlantic Region and any other power pool in which PEPCO may thereafter participate.

"lay outside the bare terms of the contract, but was implicit in them, and was [Terminal's] reliance upon its knowledge of an average quantity of ice consumed, and probably to be needed, in the usual course of Frederick's business ... and its confidence in the stability of his enterprise, in his competency in commercial affairs, in his probity, personal judgment, and in his continuing financial responsibility." *Id.* at 595, 128 A. at 282. We added that "[t]he contract itself emphasized the personal equation by specifying that the ice was to be bought for 'use in his business as an ice cream manufacturer' " and was to be paid for, by weight, on Frederick's loading platform. *Id.*

By reason of the sale to Crane, it was no longer Frederick's business or Frederick's loading platform that was involved, but was "the business of a stranger, whose skill, competency and requirements of ice were altogether different from those of Frederick." *Id.* Frederick had a single plant in Baltimore, whereas Crane was a large scale operation that simply added another unit to its ice cream business. Terminal knew that Frederick could not carry on its business without ice and it knew about how much ice Frederick required. Crane, on the other hand, might be able to carry on its business without purchasing *any* ice from Terminal or, if the price of ice was higher in Philadelphia, use ice purchased from Terminal to supply its operation there. The effect, we said, was that Terminal "would be deprived of the benefit of its contract by the introduction of a different personal relation or element, which was never contemplated by the original contracting parties." *Id.* at 596, 128 A. at 283. We thus concluded:

"The attempted assignment before us altered the conditions and obligations of the undertaking. [Terminal] would here be obliged not only to perform the subsequent stipulations of the contract for the benefit of a stranger and in conformity with his will, but also to accept the performance of the stranger in place of that of the assignor with whom it contracted, and upon whose personal integrity, capacity and management in the course of a particular business he must be assumed to have relied by reason of the very nature of

the provisions of the contract and of the circumstances of the contracting parties."

*Id.* at 599, 128 A. at 284.

The principles applied in *Crane* were not new to that case, but were taken from earlier cases in both this Court and the United States Supreme Court. *See* cases cited *id.* at 599–600, 128 A. at 284. Nor are they outdated. We have cited *Crane* with approval on several occasions. *See Property Owners v. City of Balto.,* 268 Md. 194, 200, 299 A.2d 824, 827 (1973); *Macke Co. v. Pizza of Gaithersburg, supra,* 259 Md. 479, 482, 485, 270 A.2d 645, 647, 648 (1970). *See also* 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 884, at 488 (Interim Ed.2002). Although these principles were applied in *Crane* in the context of whether an assignment was permissible, they relate as well to whether the APSA actually constituted an assignment, for if it would be impermissible to transfer those kinds of rights and obligations under a transaction that clearly *was* an assignment, it surely is at least equally impermissible to transfer them, in contravention of an anti-assignment provision, by a transaction clothed as something else.

The transfer of rights and obligations in Schedule 2.4D intrudes far more on Panda's legitimate expectations in the PPA than did the assignment in *Crane* impact on Terminal's expectations. The APSA involves a great deal more than merely a resale of electricity purchased from Panda and even more than the effective substitution of one customer for another. Much of Panda's control over its own facility and business was subject to the approval and cooperation of PEPCO; indeed, to a large extent, the operation of the facility was, in many important respects, almost a joint venture. In agreeing to that kind of arrangement, Panda necessarily was relying on its perceptions of PEPCO's competence and managerial style. One does not ordinarily choose a business partner by auction or lottery, and there is no evidence that Panda did so in this case. Paraphrasing § 318(2) of the RESTATEMENT, Panda has "a substantial interest in having [PEPCO] perform or control the acts promised." Under Schedule 2.4D, that

control has been delegated irrevocably to SEI—a stranger to Panda—with the ability of SEI to delegate it to others.

PEPCO's argument that the language in Schedule 2.4D designating SEI as its exclusive agent for all purposes only "to the fullest extent permitted under the ... PPA" somehow makes that designation consistent with the PPA is unwarranted. Virtually none of the rights and responsibilities transferred to SEI under Schedule 2.4D are permitted under § 19.1 of the PPA. The "fullest extent permitted" language therefore has no real meaning. We hold that Schedule 2.4D constitutes an assignment of rights and obligations under the PPA in contravention of § 19.1 of that agreement and that it is therefore invalid and unenforceable.

That holding presents an issue that was not considered by the PSC, the Circuit Court, or the Court of Special Appeals. Section 12.11 of APSA provides that, if any provision of the agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, "all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect," and that, upon such a determination, the parties "shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law...."

The effect of that severability clause is a matter of contract interpretation rather than of public utility policy, and would seem to be governed by its own unambiguous language and straightforward principles of contract law. Nonetheless, as Panda presented the validity of the APSA first to the PSC and thus invoked the administrative process, we shall not resolve it in this judicial review action. Either party may, in light of our conclusion that Schedule 2.4 constitutes an impermissible assignment or delegation in contravention of § 19.1 of the PPA, raise the issue before the PSC if they are unable to resolve it amicably. Should the jurisdiction of the PSC again be invoked, the PSC can also address the question of whether Panda's refusal to consent to the assignment is unreasonable, if that issue is presented.

## Approval on Public Policy Grounds

Citing two FERC decisions, *New England Power Company, et al.,* 82 F.E.R.C. ¶ 61,179 (1998) and *Potomac Electric Power Company, et al.,* 93 F.E.R.C. ¶ 61,240 (2000), the Court of Special Appeals concluded that FERC and PSC, on public policy grounds, have the authority "to validate transactions that violate anti-assignment provisions that would entitle the complaining party to assert a cause of action under Maryland contract law" and that "[t]he fact that Pepco-[SEI] contract conflicts with the anti-assignment provision of the PPA does not prohibit the PSC from approving the 'back-to-back' transaction." It was on that premise that the court, in its opinion, directed the case to be remanded to the PSC to determine whether APSA should be approved on public policy grounds.[6]

Panda contests that ruling on a number of grounds. It urges first that the issue of approval on a purely public policy basis was never presented either to the PSC or to the Circuit Court by PEPCO, and that it was therefore inappropriate for the Court of Special Appeals even to consider the matter. It contends as well that (1) the APSA constitutes a wholesale contract to supply electricity and that the PSC has no substantive jurisdiction over such contracts, and (2) annulling the anti-assignment provision of the PPA would constitute the impairment of the obligation of that contract in contravention of Article I, § 10 of the U.S. Constitution.

The PSC and PEPCO respond that the public policy issue *was* raised before the PSC and that Maryland Rule 8–131(a) gives the Court of Special Appeals discretion to consider an issue even if it was not raised below. With respect to PSC jurisdiction, they urge that Panda waived any complaint about

---

6. The actual mandate of the Court of Special Appeals simply affirmed the judgment of the Circuit Court, without directing any remand to the PSC. The Circuit Court also remanded the case to the PSC "for further determination consistent with this finding." What kind of determination the Circuit Court had in mind is unclear. It does not appear to us that such a remand would permit the kind of determination anticipated by the Court of Special Appeals, however. That is something added by the Court of Special Appeals.

jurisdiction by invoking it in the first place and that, in any event, jurisdiction exists to resolve any dispute arising under the PPA. Finally, citing *Yeatman v. Public Service Com.*, 126 Md. 513, 95 A. 158 (1915), they assert that we have long recognized that the PSC is empowered to modify private contracts involving public utilities subject to PSC regulation on public policy grounds without running afoul of the impairment clause of the Constitution.

▆ There is no need for us to delve into the jurisdictional and Constitutional issues. The fact is that the question of whether the PSC has any authority to validate and enforce provisions in an agreement that are prohibited under Maryland contract law by an anti-assignment clause was never presented to or decided by either the PSC or the Circuit Court. It was never raised in the Court of Special Appeals and should not have been determined gratuitously by that court.

We note at the outset that no assertion has ever been made, either by PEPCO or by the PSC, that the anti-assignment provision in § 19.1 of the PPA is against public policy or is in any way invalid. Panda had good reason to insist on it, PEPCO agreed to it, and, in 1992, the PSC approved it. Panda's Motion for Relief, that triggered this action, was founded upon the validity of § 19.1. Panda complained that PEPCO was intending to ignore the provision and proceed with an effective assignment of the PPA. That was the basis for its request that the auction be postponed.

PEPCO's response was that the APSA would not violate § 19.1. It asserted that under the APSA, "PEPCO will *not* assign the PPA to SEI without Panda's consent" but rather that

> "[e]ither PEPCO will obtain Panda's consent to an assignment of the PPA to the Buyer, which would entail a legal novation of the PPA as between Panda and SEI, or PEPCO will obtain a final and nonappealable order from this Commission declaring that certain back-to-back transactions involving PEPCO's resale of power to SEI and appointment

of SEI as its agent for certain purposes under the PPA, do not constitute a legal assignment of the PPA requiring Panda's consent and, therefore, do not violate the PPA." That, indeed, is what it sought—"a Declaratory Order on the very issue that underlies Panda's motion—whether certain transactions contemplated as part of the auction are subject to Panda's consent under its power purchase agreement with PEPCO. . . ." Nowhere in its response or request for Declaratory Order did PEPCO seek approval of the APSA or abrogation of § 19.1 of the PPA on the ground of public policy.

Nor did the PSC ever determine that Schedule 2.4 of the APSA should be approved on purely public policy grounds. It too stated the issue before it as "whether the proposed 'back-to-back' transaction constitutes an assignment," and its ultimate determination was that "the proposed 'back-to-back' transaction is not an assignment or transfer within the meaning of Section 19.1 of the PPA and that, under the facts before us, Pepco is not assigning or transferring to SEI significant obligations and rights under the PPA." In reaching that conclusion, the PSC did cite several FERC decisions, but only for the proposition that contracts like the APSA were merely resales of power and did not constitute an assignment of other contracts.

The parties recognized the limited holding of the PSC in the memoranda they filed in the Circuit Court. Panda—the party that sought judicial review—raised the question of whether the PSC erred "in concluding, as a matter of law, that the contract between PEPCO and SEI did not constitute an assignment, transfer or delegation of PEPCO's rights and duties under the express provisions of PEPCO's contract with Panda." PEPCO stated the questions presented as whether the PSC ruling "that the back-to-back transaction was not an assignment, transfer, or delegation of the PPA was a mixed determination of fact and law as to which substantial deference is due" and whether the PSC "correctly found on the evidence presented to it that the back-to-back transaction did not constitute an 'assignment, transfer or delegation' of PEPCO's rights and obligations under Section 19.1 of the PPA."

The Circuit Court dealt only with that limited issue—an "interpretation of the contract between Pepco and Panda and the interpretation of the contract between Pepco and Southern Energy as it constitutes a violation of the terms of the contract between Pepco and Panda." The court concluded that the APSA was not a "back-to-back" transaction but rather a violation of § 19.1 of the PPA. The Circuit Court did not consider, and was not asked to consider, whether the PSC had any authority to validate the APSA in light of that conclusion.

Nor was that question ever apparently raised in the Court of Special Appeals. PEPCO complained that the Circuit Court "erred in undertaking *de novo* review of the PSC's order," that it erred "in its *de novo* determination that the back-to-back transaction violated Section 19.1 of the PPA," and that the PSC "correctly determined on the evidence before it that the back-to-back transaction under the APSA did not constitute a violation of Section 19.1 of the PPA." In its brief, the PSC essentially restated those limited issues—whether the Circuit Court improperly applied *de novo* review of the Commission's decision and whether the Commission "properly determined that [the] 'back to back' arrangement between PEPCO and [SEI] does not constitute an assignment requiring Panda's consent."

We have long and consistently made clear that, in an action for judicial review of an adjudicatory decision by an administrative agency, a reviewing court ordinarily "may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency." *Dept. of Health v. Campbell*, 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001); *see also Brodie v. MVA*, 367 Md. 1, 3–4, 785 A.2d 747, 749 (2001) and cases cited there, and *Delmarva Power v. PSC*, 370 Md. 1, 32, 803 A.2d 460, 478 (2002). That alone made it improper for the appellate court to address the public policy question, especially as it raises serious issues under provisions in both the U.S. and Maryland Constitutions that prohibit the impairment of contract rights. The fact that the question was never raised in the Circuit

Court or briefed in the Court of Special Appeals exacerbated that impropriety. Panda never had an opportunity to defend against the proposition that the PSC could ignore a valid contractual provision such as § 19.1, that it previously had approved, in the absence of any finding that the overall sale of PEPCO's generating assets could not have proceeded without the extensive agency provisions of Schedule 2.4.

There is no basis for directing a remand to the PSC; there is nothing that, as a result of our holding, the PSC is required to do in order to complete an adjudication of the issues that had been presented to it. As we noted, there may be some issues that, if the parties are unable to resolve, may properly be brought before the PSC. Our holdings in this case are without prejudice to either party seeking an administrative resolution of those issues.

TO THE EXTENT THAT THE JUDGMENT OF THE COURT OF SPECIAL APPEALS DIRECTS A REMAND TO THE PUBLIC SERVICE COMMISSION, IT IS VACATED; JUDGMENT OF COURT OF SPECIAL APPEALS OTHERWISE AFFIRMED; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS PEPCO AND PSC.