23 A.3d 269

**Mahmaud SHIRAZI, M.D.**

v.

**MARYLAND STATE BOARD OF PHYSICIANS.**

No. 1715, Sept. Term, 2009.

Court of Special Appeals of Maryland.

July 1, 2011.

Paul J. Weber (Mark Rosasco, Hyatt & Weber, PA, on the brief), Annapolis, MD, for appellant.

Thomas W. Keech (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., MATRICCIANI and JAMES P. SALMON (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

After the Circuit Court for Wicomico County affirmed the permanent revocation of his medical license by the Maryland State Board of Physicians ("Board" or "Board of Physicians"), Mahmaud Shirazi, M.D., noted this appeal, presenting two issues:

I. Whether the Board abused its discretion in failing to refer [appellant's] case to the Maryland Professional Rehabilitation Program for evaluation, training and consideration of reinstatement to practice with or without restrictions.

II. Whether the Board's sanctioning of [appellant] was arbitrary and inconsistent with its prior actions.

Because the Board neither abused its discretion nor acted arbitrarily in sanctioning appellant, we affirm.

## BACKGROUND

Following a hearing, the presiding administrative law judge ("ALJ") issued a proposed decision in this case setting forth findings of fact and conclusions of law that were subsequently adopted by the Board of Physicians. The recitation of facts and quotations that follows is based largely on those now uncontested findings.[1]

Appellant, a licensed physician in Maryland, maintained an office at Peninsula Internal Medicine, a private practice owned by Candy L. Burns, a family nurse practitioner, and held privileges at Peninsula Regional Medical Center. Both the practice and the Center are located in Salisbury, Maryland, and it was at those two locations that the sexual misconduct, which was the subject of the proceedings below, occurred.

In early October, 2006, Patient A, a forty-eight-year-old woman, sought medical treatment from appellant for ongoing back, hip and shoulder pain, as well as a rash on her right hip.[2] She visited appellant at his office at Peninsula Internal Medicine, three times, during the months of October and November 2006. During the third visit on November 15, 2006, while appellant and Patient A were alone in an examining room, appellant stood directly behind her, placed his hands on her hips, and ground his pubic area against her buttocks for 60 to 90 seconds. Then, while ostensibly examining a rash on her hip, appellant "grabbed her underwear and forcefully pulled them down to her knees." Looking at her vaginal area and remarking that it was dry, he inserted his bare finger into her vagina, and then, placing it under his nose, he smelled it.

---

1. Appellant does not challenge the Board's factual findings.

2. Because the former patients in this case were sexually assaulted, we shall identify them by reference to the letter designations used by the Board.

Although Patient A became "extremely upset," appellant "continued to sniff his finger[.]" He then wrote a prescription for Estrace,[3] but did not prescribe any treatment for the rash. "[S]haking uncontrollably," Patient A left appellant's office without telling anyone about what had happened.

On December 12, 2006, Patient A returned to Peninsula Internal Medicine, complaining of a cough, breathing problems, and an elevated temperature. When she arrived, she requested a different doctor. Informed that no other doctor, but appellant, was available, Patient A insisted that a female Peninsula Internal Medicine employee accompany her while she was being seen by appellant. Although, as the ALJ noted, he did not perform a physical examination, appellant diagnosed Patient A as suffering from bronchitis and acute sinusitis. Ordering a breathing treatment, he left the room. After that visit, Patient A did not talk to appellant or return to be seen by him; all of her future contact with Peninsula Internal Medicine was limited to female staff members.

In April 2007, Patient A was still receiving bills from Peninsula Internal Medicine which, in her view, were unjustified. She called Kimberly Elliott, Peninsula Internal Medicine's office manager, to complain. During that conversation, Patient A disclosed to Ms. Elliott what had occurred on November 15th. Ms. Elliott immediately referred her to Candy Burns, the owner of Peninsula Internal Medicine, who then insisted upon a face-to-face meeting with Patient A. At the meeting, several days later, Ms. Burns provided Patient A with a complaint form to be filed with the Board. On April 9, 2007, Patient A reported the incident to the Wicomico County Bureau of Investigation, and a week later, filed a complaint with the Board. As a result of the November 15th incident, Patient A has suffered anxiety, mood swings, nightmares, and

---

3. Estrace is a brand name for an estradiol cream, "used to treat vaginal dryness, itching, and burning." *Estrogen Vaginal,* available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000333 (last visited Jun. 21, 2011).

panic attacks, and has been in need of mental health counseling.

On May 1, 2007, criminal charges were filed against appellant, alleging he had committed third- and fourth-degree sex offense and second-degree assault against Patient A on November 15, 2006. Appellant was tried on those charges, and on February 22, 2008, a jury sitting in the Circuit Court for Wicomico County acquitted him.

In October 2005, Patient B, a fifty-two-year-old woman, was admitted to the emergency room of Peninsula Regional Medical Center for shortness of breath, wheezing, and a cough. She was treated by appellant in a semi-private room, with only a curtain separating her from the room's other patient. "Initially, [appellant] listened to Patient B's chest and asked her about her medical history. [She] told [him] about previously scheduled gall bladder surgery, previous brain surgery and that her surgeon had ordered a CT scan that had revealed an ovarian cyst." She "did not complain of abdominal or pelvic pain." Nevertheless, appellant told her he wanted to perform a "quick check" and asked her to pull down her underwear. Then, without washing his hands, appellant "placed two of his fingers inside her vagina, with the other hand on her abdomen, and performed an internal examination." When appellant was finished, he took his fingers out of her vagina and wiped them underneath his nose.

After Patient B informed her daughter and both of her sisters of what appellant had done, her daughter contacted the hospital. And "[l]ater on the same day, Patient B reported [appellant's] actions to her nurse and told her that she was concerned because [appellant] had done a full pelvic and breast exam on her without gloves and without washing his hands before or after."

The following day, appellant, accompanied by two nurses, visited Patient B in her hospital room. Appellant told Patient B that he had not done a full pelvic examination of her, but rather, had only felt her outer pelvis. Patient B "insisted this was not true and that [appellant] had placed his fingers inside

of her." When appellant again denied her allegations, she "became extremely upset and told [appellant] to get out of the room and asked for a new doctor." The hospital assigned a different doctor to treat Patient B.

Peninsula Regional conducted an investigation into the incident with Patient B but took no action because, as noted in the quality assurance file the hospital kept on appellant, it was "unable to 'substantiate the patient's allegations.' " The hospital did, however, recommend to appellant that, in the future, he should always " 'obtain a nurse or other female chaperone' " whenever conducting an examination of a female patient and warned him that " '[i]f there are any future allegations of this nature, an extremely detailed investigation will ensue and appropriate actions taken on the basis of the findings.' "

Patient B notified the Wicomico County Bureau of Investigation of the incident after learning that, in May 2007, appellant had been arrested for sex offenses involving Patient A. As a result of the October 2005 episode, Patient B has suffered from depression and has sought medical treatment for that condition.

On September 29, 2005, Patient C, a forty-two-year-old woman, was admitted to Peninsula Regional Medical Center for symptoms of diarrhea, abdominal pain, and nausea. When she was found to have gallstones, she was scheduled for surgery. Appellant was her admitting physician, but not her surgeon.

On October 2, 2005, Patient C's surgeon performed laparoscopic[4] surgery on her gall bladder. While recuperating in her room at Peninsula Regional, appellant visited her. "During the visit, he sat on the right side of her bed, lifted her gown, examined her abdomen and inserted his fingers into her vagina." He then left the room "abruptly," without "wash[ing]

---

4. A laparoscope is an "endoscope for examining the peritoneal cavity." STEDMAN'S MEDICAL DICTIONARY 1047 (28th ed.2006). Using such a tool, a surgeon may operate on a patient using only relatively small incisions. *Id.* at 1047–48.

his hands before or after." Later the same day, Patient C informed her daughter and her cousin what had happened.

The following day, appellant re-visited Patient C in her room, and there, once again inserted his fingers into her vagina. "At this point, Patient C became tense and moved causing [appellant] to withdraw his fingers. He left the room abruptly without washing his hands."

After she was discharged from Peninsula Regional Medical Center, Patient C informed her husband of what had happened. She and her husband, at that time, decided not to report the incidents. But, in May 2007, after reading a newspaper report regarding appellant's arrest, she notified Ms. Burns of the October 2005 incidents at Peninsula Regional. Ms. Burns referred her to the Wicomico County Bureau of Investigation, which reported the allegations to the Board. As a result of the two incidents, Patient C has suffered from sleeping disorders and has been unable to have intimate relations with her husband. She has sought medical treatment for both problems.

On September 17, 2004, Patient D, a thirty-five-year-old woman, made an appointment at Peninsula Internal Medicine for treatment of a rash on her thigh near her pelvic region. Appellant performed a physical examination of her. He did not wash his hands, nor did he wear gloves. "During the exam, [he] touched the rash and stated that he needed to make sure that the rash had not 'gone below.'" He asked Patient D to remove her pants and underwear, but did not offer a gown or sheet to cover herself. Appellant "inserted his forefinger into her vagina without a glove, then withdrew it." He left the examination room "abruptly without saying a word or washing his hands."

"Sometime in February or March 2005, Patient D spoke with a friend who had had a similar experience with [appellant]; Patient D shared her experience with this friend at this time." In May 2007, after learning of appellant's arrest, Patient D informed her husband of what had happened in September 2004. Her husband then contacted Ms. Burns,

who in turn notified the Wicomico County Bureau of Investigation. The Bureau thereupon notified the Board of Patient D's allegations against appellant.

In May 2007, the Board opened an investigation of appellant based on the complaint it had received from Patient A, alleging that appellant had touched her inappropriately while rendering medical treatment. On June 18, 2007, now informed of the allegations of Patients A, B and C, the Board summarily suspended appellant's license to practice medicine. On July 25, 2007, the Board held a hearing and upheld its summary suspension. Following the suspension, the Board, while conducting its own investigation, became aware of the incident involving Patient D.

On March 13, 2008, the Board filed charges against appellant, alleging immoral or unprofessional conduct in the practice of medicine, in violation of the Maryland Medical Practice Act, Maryland Code (1981, 2005 Repl.Vol., 2007 Supp.), § 14–404(a) of the Health Occupations Article ("HO").[5] A contested hearing was held on October 1 through 7, 2008 before an ALJ, under HO § 14–405,[6] which requires the Board to "give the

---

**5.** All statutory references shall be to the versions in effect at the time the Board instituted administrative proceedings against appellant, on June 18, 2007. Prior to June 1, 2007, HO § 14–404(a)(3) proscribed "immoral or unprofessional conduct in the practice of medicine."

Effective June 1, 2007, the statute provided in relevant part:

(a) In general.—Subject to the hearing provisions of § 14–405 of this subtitle, the Board, on the affirmative vote of a majority of the quorum, may reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the licensee:

\* \* \*

(3) Is guilty of:
(i) Immoral conduct in the practice of medicine; or
(ii) Unprofessional conduct in the practice of medicine[.]

\* \* \*

Md.Code (1981, 2005 Repl.Vol., 2007 Supp.), § 14–404 of the Health Occupations Article ("HO"). A substantially similar provision currently is codified at § 14–404(a) in the 2009 Replacement Volume.

**6.** In relevant part, HO § 14–405 provides:

(a) Right to hearing.—Except as otherwise provided in the Administrative Procedure Act, before the Board takes any action under § 14–

individual against whom the action is contemplated an opportunity for a hearing." The ALJ issued a proposed decision containing findings of fact and conclusions of law that were subsequently adopted by the Board. The ALJ concluded that appellant had engaged in immoral or unprofessional conduct in the practice of medicine, proposed that the charges filed by the Board be upheld, and recommended that appellant's license to practice medicine be revoked.

On March 17, 2009, the Board issued a Final Order, in which it found that appellant had "used his position as a physician to take advantage of four women who relied on him for their medical treatment," finding "in each case a demeaning sexual assault that had serious emotional consequences for these women." Consequently, the Board permanently revoked appellant's medical license, expressly stating that it "will not accept any application for reinstatement from [appellant]." Following the Board's decision, appellant filed in the Circuit Court for Wicomico County a petition for judicial review. After the circuit court upheld the Board's revocation of appellant's medical license, he noted this appeal.

## DISCUSSION

### I.

Appellant contends that the Board abused its discretion in failing to refer his case to the Maryland Professional Rehabilitation Program ("Rehabilitation Program") for evaluation, training and consideration for reinstatement to practice, because he suffers from a disability, which he vaguely describes as "a psychological impairment." The Board's failure

---

404(a) of this subtitle or § 14–5A–17(a) of this title, it shall give the individual against whom the action is contemplated an opportunity for a hearing before a hearing officer.

(b) Application of Administrative Procedure Act.—

    (1) The hearing officer shall give notice and hold the hearing in accordance with the Administrative Procedure Act.

to refer him to the Rehabilitation Program, he maintains, is tantamount to a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

As the Board points out, appellant first raised this issue before the circuit court, not during the administrative proceedings. Accordingly, this issue is not preserved for appellate review. *Pridgeon v. Bd. Of License Comm'rs,* 406 Md. 229, 239 n. 2, 958 A.2d 289 (2008). In *Delmarva Power & Light Co. v. Public Service Commission,* 370 Md. 1, 32, 803 A.2d 460 (2002), the Court of Appeals explained: "We do not allow issues to be raised for the first time in actions for judicial review of administrative agency orders entered in contested cases because to do so would allow the court to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency." *Accord Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 518, 390 A.2d 1119 (1978).

Moreover, had this issue been preserved, we would have found that it is without merit. We explain.

The Rehabilitation Program is statutorily defined as

the program of the Board or the nonprofit entity with which the Board contracts under § 14–401(g) of this title that evaluates and provides assistance to *impaired physicians* and other health professionals *regulated by the Board who are directed by the Board* to receive treatment and rehabilitation for alcoholism, chemical dependency, or other physical, emotional, or mental conditions.

HO § 14–101(k)[7] (emphasis added).

■ In turn, HO § 14–401(g) provides:

(1) Except as provided in paragraph (2) of this subsection, on or before January 1, 2008, the Board shall issue a request for proposals and enter into a written contract with

---

(2) Factual findings shall be supported by a preponderance of the evidence.

*    *    *

7. The identical provision currently is codified at § 14–101(m) in the 2009 Replacement Volume.

a nonprofit entity to provide rehabilitation services for *physicians* or other allied health professionals *directed by the Board* to receive rehabilitation services.

(2) If the Board does not receive a responsive proposal under paragraph (1) of this subsection or is not able to contract with a nonprofit entity, the Board shall provide directly rehabilitation services for physicians.

(Emphasis added.) The two statutes apply only to "physicians ... directed by the Board to receive" treatment and rehabilitation services, and neither statute *requires* the Board to direct every, or for that matter, any impaired physician to the Rehabilitation Program. Moreover, as the Board points out in its brief, "[a]t no point during the administrative proceedings did appellant offer any evidence that he suffered from [alcoholism, chemical dependency, or other physical, emotional, or mental conditions]." Indeed, during the circuit court's judicial review hearing, the Board's counsel aptly summed up appellant's entire defense during the administrative proceeding as follows:

[Appellant's] position was consistent throughout the administrative proceedings, his position was I did not do it, beginning to end, that's what he said. No one believed him, ... they believed the four victims and the other witnesses. He doesn't dispute that belief, he doesn't dispute that credibility finding. He simply treated this case as a factual case and he disputed the facts and he lost.

On this record, the Board can hardly be faulted for not referring this matter to the Rehabilitation Program if it was required to do so, which it was not.

## II.

■■■ Appellant claims that the Board's sanction, permanently revoking his medical license, was "arbitrary and inconsistent with its prior actions," describing it as a "disproportionate punishment," when compared to the sanctions meted out to other physicians for similar conduct.

This argument also slips beneath the waves of non-preservation. As the Board points out, appellant first raised this issue in the action for judicial review, not during the administrative proceedings. *See Pridgeon, supra,* 406 Md. at 239 n. 2, 958 A.2d 289 ("issue could not be raised for the first time during judicial review"); Thus, appellant's argument was not preserved. Even if this issue had been properly preserved, we would find it completely without merit.

█ Appellant's contention amounts to a claim that the Board acted arbitrarily or capriciously. Appellant is correct—but only as to the premise that, although we normally uphold an administrative agency's decision to impose a particular sanction, we do not do so where, in imposing that sanction, an agency acted arbitrarily or capriciously. Md.Code (1984, 2004 Repl.Vol.), § 10–222(h)(3)(vi) of the State Government Article ("SG");[8] *Md. Aviation Admin. v. Noland,* 386 Md. 556, 574–77, 873 A.2d 1145 (2005); *Spencer v. Md. State Bd. Of Pharmacy,* 380 Md. 515, 529–31, 846 A.2d 341 (2004). To be more specific:

As long as an administrative sanction . . . does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on

---

**8.** Md.Code (1984, 2004 Repl.Vol.), § 10–222 of the State Government Article ("SG"), entitled "Judicial review," provided in relevant part:

       *      *      *

(h) Decision.—In a proceeding under this section, the court may:
  (1) remand the case for further proceedings;
  (2) affirm the final decision; or
  (3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:
    (i) is unconstitutional;
    (ii) exceeds the statutory authority or jurisdiction of the final decision maker;
    (iii) results from an unlawful procedure;
    (iv) is affected by any other error of law;
    (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or
    (vi) is arbitrary or capricious.
The 2009 Replacement Volume contains an identical provision.

disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'

*Md. Transp. Auth. v. King,* 369 Md. 274, 291, 799 A.2d 1246 (2002).

The sanction the Board imposed, permanent revocation of appellant's medical license, was plainly within the Board's statutory authority. At the time administrative proceedings against appellant commenced, HO § 14–404(a)(3) expressly provided that "the Board, on the affirmative vote of a majority of the quorum, may . . . revoke a license if the licensee . . . [i]s guilty of . . . [i]mmoral conduct in the practice of medicine; or [u]nprofessional conduct in the practice of medicine[.]" It then "may" reinstate the license, but only under the conditions set forth in HO § 14–409 ("Reinstatement of suspended or revoked license"):

(a) In general.—Except as provided in subsection (b) of this section, the Board may reinstate the license of an individual whose license has been suspended or revoked under this title only in accordance with:

   (1) The terms and conditions of the order of suspension or revocation;

   (2) An order of reinstatement issued by the Board; or

   (3) A final judgment in any proceeding for review.

(b) Requirements for reinstatement.—An individual whose license has been suspended or revoked under this title and who seeks reinstatement shall meet the continuing medical education requirements established for the renewal of licenses as if the individual were licensed during the period of suspension or revocation.

(c) Suspension or revocation for crime involving moral turpitude.—If an order of suspension or revocation is based on § 14–404(b) of this subtitle, and the conviction or plea subsequently is overturned at any stage of an appeal or

other postconviction proceeding, the suspension or revocation ends when the conviction or plea is overturned.

Although § 14–409 permits reinstatement, it does not require that the Board ever reinstate a physician's license.

Moreover, there is no dispute that the Board properly followed the procedural strictures of HO §§ 14–405 (governing right to hearing) and 14–408 (providing for judicial review of Board's order). Therefore, the Board's actions were lawful.

Because appellant does not contest the Board's factual findings, it is undisputed that the administrative sanction in this case is supported by competent, material and substantial evidence. Finally, under *King, supra*, 369 Md. at 291, 799 A.2d 1246, the only other basis upon which this Court can modify or reverse the sanction at issue is if it found that, "under the facts of [this] case, the disproportionality or abuse of discretion was so extreme and egregious that [we] can properly deem the decision to be 'arbitrary or capricious.'" Plainly, that was not the case here, where the Board found, by a preponderance of the evidence, that appellant sexually assaulted four female patients over a period of two years.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY UPHOLDING THE FINAL DECISION OF THE MARYLAND STATE BOARD OF PHYSICIANS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**